# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-06-00067-CR

**Anthony Ruiz, Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 403RD JUDICIAL DISTRICT
## NO. 3040682, HONORABLE BRENDA KENNEDY, JUDGE PRESIDING

## O P I N I O N

A jury convicted appellant Anthony Ruiz of aggravated sexual assault of a child, indecency with a child by contact, and indecency with a child by exposure. *See* Tex. Penal Code Ann. § 21.11 (West 2003) (indecency with a child), § 22.021(a)(1)(B) (West Supp. 2008) (aggravated sexual assault of a child). The jury sentenced him to 60 years' imprisonment for sexual assault, 20 years' imprisonment for indecency by contact, and 10 years' imprisonment for indecency by exposure. In five issues, appellant argues that: he was denied his right to confront and cross-examine the witnesses against him in violation of his Sixth Amendment rights, the trial court gave an erroneous jury charge that deprived appellant of his right to a unanimous verdict, the State gave the jury the false impression that there was no outcry made by the complainant against her grandfather, the trial court erred when it refused to give a limiting instruction on erroneously elicited evidence, and the court erred in admitting hearsay evidence. We affirm the trial court's judgments.

## Background

K.T., the complainant, was sixteen years' old when she testified against appellant. She testified that when she was four or five, her mother, H.V., began dating appellant and that eventually H.V., K.T., and K.T.'s younger brother began living with him. K.T. testified that when she was in kindergarten, appellant came into the room that K.T. shared with her brother, told her to lie on the floor, lifted her nightgown and removed her underwear, covered her mouth, and touched her "with his penis in [her] private area." When she told him it hurt and started to cry, he got up and left the room, telling her not to tell anyone. She said she was scared that if she told anyone, appellant would hurt someone in her family. K.T. said the abuse continued about twice a week while she lived with her mother and appellant but could not remember how many times she was abused in the different places she lived with them. K.T. testified that appellant repeated his assaults about twice a week while she lived with him and that even after she and her brother went to live with their father, the abuse continued when she visited H.V. on weekends.

K.T. testified that during the first weekend visitation, everyone was happy to see each other and appellant was "being very nice to" K.T. and gave her a necklace he bought for her. That night, however, appellant woke her, took her upstairs, removed his and her clothes, and touched her private area. She testified that he put his penis inside her private area and made a "grunting" noise and that for the first time in the years of abuse, she noticed a substance that was "white and sticky." After the abuse, appellant again told K.T. not to tell anyone or he would hurt her mother or brother. The abuse continued until K.T. decided to cease visitation when she was in the fifth grade. K.T. testified that throughout the years of abuse, appellant put his penis on and in her vagina, put his

2

penis in her mouth, made her touch his penis with her hand, and put his mouth on her breasts and genitals. She testified that she never saw appellant's penis because she always kept her eyes shut but she thought that her "private part was exposed so that he could see it or touch it, skin to skin." K.T. testified that when she was in the eighth grade, she finally told her stepmother about the abuse. K.T.'s stepmother urged K.T. to make a police report, but K.T. was at first "hesitant" to do so. She went to counseling and after several months reported the abuse to the authorities.

The State indicted appellant for three counts. Count I alleged aggravated sexual assault, alleging that appellant knowingly and intentionally:

(a) penetrated K.T.'s female sexual organ with his sexual organ, *see* Tex. Penal Code Ann. § 22.021(a)(1)(B)(i);

(b) caused K.T.'s sexual organ to contact his mouth, *see id.* § 22.021(a)(1)(B)(iii);

(c) caused KT's sexual organ to contact his sexual organ, *see id.* § 22.021(a)(1)(B)(iii); and

(d) penetrated K.T.'s mouth with his sexual organ, *see id.* § 22.021(a)(1)(B)(ii).

Count II charged appellant with indecency with a child by contact, alleging that he intentionally and knowingly: engaged in sexual contact with K.T. by (a) touching her genitals and (b) causing her to touch his genitals, *see id.* § 21.11(a)(1), (c); and count III charged him with indecency by exposure, alleging that appellant (a) exposed a part of his genitals to K.T. and (b) caused her to expose any part of her genitals, *see id.* § 21.11(a)(2). The jury charge allowed the jury to convict appellant of count I if it found appellant had penetrated K.T.'s sexual organ with his sexual organ, caused her sexual organ to contact his mouth, *or* caused her sexual organ to contact his sexual organ; the charge did

3

not require a unanimous verdict on which of the three allegations the jurors found to be true. Similarly, the charge allowed the jury to convict appellant of counts II and III if it found one paragraph for each count to be true without requiring unanimity about the allegation the jurors found true. The jury convicted appellant of all three counts.

## Jury Unanimity

In his second issue, appellant argues that the trial court's jury charge erroneously allowed the jury to reach a non-unanimous verdict. Appellant claims that because the jury charge instructed jurors in the disjunctive for all three counts, "it allowed the jury to return guilty verdicts without requiring unanimity as to a specific criminal act."

The State concedes that count one, alleging aggravated sexual assault, was erroneous, but argues that counts two and three were not. It argues that section 21.11 of the penal code, defining indecency with a child by contact and by exposure, merely provides different means for committing the offense of indecency, rather than setting out different offenses. We disagree.

Section 21.11(a)(1) "criminaliz[es] only three specific types of acts" as indecency with a child by contact—touching the child's anus, breast, or genitals—and each act "represents a different offense." *Pizzo v. State*, 235 S.W.3d 711, 717 (Tex. Crim. App. 2007). This is true whether the defendant touches the breast, anus, and genitals of the child during the same incident or during three different incidents. *Id.* at 718; *Francis v. State*, 36 S.W.3d 121, 124 (Tex. Crim. App. 2000). Similarly, section 21.11(a)(2) defines indecency by exposure as exposing a child's genitals or exposing the defendant's genitals to a child. Tex. Penal Code Ann. § 21.11(a)(2).

4

K.T. testified that appellant assaulted her numerous times over several years, but only provided detailed testimony about a few particular incidents, saying that appellant committed similar acts during the frequent assaults. Thus, in arriving at a verdict, one juror could have believed that appellant touched K.T. on her genitals on one day and another could have believed that he caused her to touch his genitals one year later. *See Francis*, 36 S.W.3d at 125. We hold that the jury charge erroneously allowed for the possibility of non-unanimous verdicts on all three counts. *See Mathonican v. State*, 194 S.W.3d 59, 66 (Tex. App.—Texarkana 2006, no pet.) ("Thus, the trial court's charge should have required independent verdicts on each of these different charges [causing victim's penis to penetrate defendant's anus or mouth or causing defendant's penis to penetrate victim's mouth]. Instead, the trial court's general verdict form required only a single verdict, without requiring the jury to differentiate among the charges in the indictment's second count [sexual assault]. Accordingly, the jury charge contained error by not requiring a unanimous verdict.").

Jury-charge error such as this has been labeled "fundamental" error. *See Sanchez v. State*, 209 S.W.3d 117, 121 (Tex. Crim. App. 2006). However, fundamental, even "constitutional" error, that falls short of being "structural" error is subject to harmless-error analysis. *Hedgpeth v. Pulido*, No. 07-544, 2008 U.S. LEXIS 8881, at *5-6 (Dec. 2, 2008) (quoting *Neder v. United States*, 527 U.S. 1, 11 (1999)) ("harmless-error analysis applies to instructional errors so long as the error at issue does not categorically 'vitiat[e] *all* the jury's findings'"); *see Neder*, 527 U.S. at 19 (jury charge omitted element of offense; Court held that if, after reviewing the record, "the court cannot conclude beyond a reasonable doubt that the jury verdict would have been

5

the same absent the error . . . it should not find the error harmless"); *Rose v. Clark*, 478 U.S. 570, 579-80 (1986) (jury instructions improperly shifted burden of proof as to malice; Court held that despite error, defendant had "full opportunity to put on evidence and make argument to support his claim of innocence" and was tried by "fairly selected, impartial jury, supervised by an impartial judge"; viewed in light of entire record, improper instruction did not "compare with the kind of errors that automatically require reversal of an otherwise valid conviction"); *see also Johnson v. State*, 169 S.W.3d 223, 236-37 (Tex. Crim. App. 2005) (distinguishing between "trial" and "structural" error and noting that fundamental error is not necessarily structural). Error is structural only if it "affects 'the entire conduct of the trial from beginning to end'" or "affects 'the framework within which the trial proceeds, rather than simply [being] an error in the trial process itself.'" *Johnson*, 169 S.W.3d at 237 (quoting *Arizona v. Fulminante*, 499 U.S. 279, 309-10 (1991)); *see Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986) ("harmless-error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence").

The error in this case does not rise to the level of structural error and therefore is subject to a harm analysis. *See Hedgpeth*, 2008 U.S. LEXIS 8881, at *5-6; *Neder*, 527 U.S. at 19; *Rose*, 478 U.S. at 579. Because appellant did not object, we must determine whether the error caused egregious harm in light of the entire charge, the evidence presented, arguments of counsel, and other relevant information in the record. *See Warner v. State*, 245 S.W.3d 458, 461 (Tex. Crim. App. 2008); *Martinez v. State*, 212 S.W.3d 411, 420 (Tex. App.—Austin 2006, pet. ref'd). "In examining the record to determine whether jury-charge error is egregious, the reviewing court should consider the entirety of the jury charge itself, the evidence, including the contested issues and weight

6

of the probative evidence, the arguments of counsel, and any other relevant information revealed by the record of the trial as a whole." *Sanchez*, 209 S.W.3d at 121. Whether unpreserved jury charge error is reversible depends on the circumstances of the case. *See id.*; *Olivas v. State*, 202 S.W.3d 137, 146-49 (Tex. Crim. App. 2006).[1]

The charge here used the disjunctive in instructing the jury on all three counts but also included a general instruction that "[y]our verdict must be unanimous." This instruction, however, does not explicitly state that the jurors must unanimously agree about the specific act or acts they believed appellant had committed as to each count. Thus, it weighs neither for nor against a finding of egregious harm. *See Olivas*, 202 S.W.3d at 146-47.[2] Nor were the alleged offenses mutually

---

[1] Some courts apparently start with a presumption that the error did not cause egregious harm, *see Olivas v. State*, 202 S.W.3d 137, 146-49 (Tex. Crim. App. 2006); *De Los Santos v. State*, 219 S.W.3d 71, 78-79 (Tex. App.—San Antonio 2006, no pet.); *Martinez v. State*, 212 S.W.3d 411, 420-21 (Tex. App.—Austin 2006, pet. ref'd); *Gonzales v. State*, 191 S.W.3d 741, 750-51 (Tex. App.—Waco 2006, pet. ref'd); *Martinez v. State*, 190 S.W.3d 254, 260-62 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd), while others seem to begin with an assumption of likely egregious harm, *see Mathonican v. State*, 194 S.W.3d 59, 66-67 (Tex. App.—Texarkana 2006, no pet.); *Tyson v. State*, 172 S.W.3d 172, 179 (Tex. App.—Fort Worth 2005, pet. ref'd); *Hendrix v. State*, 150 S.W.3d. 839, 849 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd); *Clear v. State*, 76 S.W.3d 622, 624 (Tex. App.—Corpus Christi 2002, no pet.).

[2] *Compare De Los Santos*, 219 S.W.3d at 78 (two references to unanimity in general instructions; when "[r]ead as a whole, the charge correctly instructed the jury that they had to unanimously agree on at least one of the application paragraphs"), *and Martinez*, 190 S.W.3d at 260-61 (disjunctive charge error in application paragraphs, but "there were at least some instances where the original jury charge error was ameliorated in another portion of the charge or by instructions from the trial court"), *with Soto v. State*, No. 13-06-00202-CR, 2008 Tex. App. LEXIS 5654, at *20-24 (Tex. App.—Corpus Christi July 29, 2008, no pet.) (charge included general instruction requiring unanimous verdict but lacked unanimity requirement in application paragraphs; court held that "[r]ead as a whole, the charge misled the jury into believing that only its ultimate verdict of 'guilty' need be unanimous" and that "'boilerplate' unanimity instruction in the jury charge was insufficient to mitigate the harm caused by the prosecutor's confusing and erroneous argument"), *and Hisey v. State*, 129 S.W.3d 649, 654 (Tex. App.—Houston [1st Dist.] 2004, pet. dism'd) (application paragraph allowed for non-unanimous verdict; court held "that the jury is presumed to have understood and followed the court's charge" and that "the erroneous charge was contained in the application paragraph, the portion of the charge that authorizes the jury to act").

7

exclusive. *See Ngo v. State*. *See* 175 S.W.3d 738, 751-52 (Tex. Crim. App. 2005) (defendant could not have committed both crimes as alleged); *Martinez*, 212 S.W.3d at 421 ("it was possible for Martinez to both contact and penetrate the victim on separate occasions").

Appellant further argues that the State worsened the error by essentially instructing the jury that it need not reach a unanimous decision about the charged offenses. We disagree. In its closing arguments, the State said, "The jury does not have to find all four of these ways [alleged in the first count] to find the defendant guilty. But it is sufficient if all of you agree that one or more of these ways have been proved." This statement, while not as clear as it could be, did not instruct the jury "that their verdict as to Count I did not have to be unanimous as to which offense was committed," as appellant argues. Instead, it instructed the jurors that they need not find that appellant had committed every one of the four acts alleged in Count I as long as they agreed that he had committed one or more of the alleged acts. Thus, the prosecutor's statement does not rise to the level of misstatement found in *Ngo*. *See* 175 S.W.3d at 750-51 (prosecutor said, "The important thing with this is that if three of you . . . feel like he stole the credit card and used it, six of you think that he received it and three of you think he presented it, it doesn't matter which one you think he did. It can be a mix and match, whichever one you believe.").[3]

---

[3] *See also De Los Santos*, 219 S.W.3d at 78-79 (charge error was not compounded by misstatements by attorneys or trial court; jury "was *never* told they could return a 'mix and match' verdict); *Gonzales*, 191 S.W.3d at 750 (prosecutor said, "This is saying or, or, or. You don't have to find all of that true in order to find the defendant guilty of aggravated assault. These are all different manners and means . . . . There is just one aggravated assault here. . . . And you must agree that he is guilty of aggravated assault."; court held that although State referred to charge error, it "did not rise to the level of accentuation of the error that occurred in *Ngo*"). *Cf. Soto*, 2008 Tex. App. LEXIS 5654, at *23-24 (error compounded when prosecutor told jury, "You don't have to agree—all of you don't have to agree that one of these happened, as long as you all agree that either one of these happened."); *Clear*, 76 S.W.3d at 623-24 (egregious harm when prosecutor said four jurors could believe one act occurred while four others could believe a different act occurred).

Nor does the state of the evidence lead us to believe that appellant suffered egregious harm as a result of the error. K.T. testified that appellant abused her over a period of years, starting when she was five years old and continuing until she was about ten. K.T. was able to describe several specific instances of sexual conduct and also testified that the same conduct occurred repeatedly throughout the years. Appellant did not attempt to argue that he was only guilty of some of the allegations. His theory was that he had not committed any of the alleged conduct and that K.T. was lying to manipulate her parents, protect her grandfather, or get revenge on appellant, who appellant argued K.T. blamed for breaking up her parents' relationship.[4] Thus, as in *Martinez*, appellant's "trial strategy left the jury with an all-or-nothing decision when evaluating each count in the charge . . . either he was guilty . . . or he was not." 212 S.W.3d at 421.[5] Having reviewed the

[4] Austin Police Detective Marci Graham testified that she interviewed appellant, K.T., and K.T.'s mother, stepmother, and therapist in response to K.T.'s allegations of being abused by appellant. Graham spoke to appellant to arrange a time to interview him and told him that "he had been named in a case and [that she] needed to speak with him about a case involving child abuse"; she did not say who the child was or whether the allegations involved sexual or physical abuse. Appellant "said it wasn't me" and "said it was [H.V.'s] dad that had abused [K.T.], not him." Two days later, during Graham's interview of appellant, appellant denied the allegations and opined that K.T. was making the accusation to get back at appellant for breaking up her parents' relationship when he had an affair with H.V. nine years earlier. He again told Graham "that it wasn't him; it was her grandfather," C.V., who had molested K.T.

[5] *See De Los Santos*, 219 S.W.3d at 79 (defendant did not contest that children had been abused but argued he was not the abuser, a defense that "presented the jury with an 'all or nothing' decision, *i.e.*, either he was the perpetrator of the sexual assaults or he was not"); *Gonzales*, 191 S.W.3d at 751 (contested issue was whether victim's injuries were self-inflicted or caused by defendant; court held, "The charge error could not have affected this contested issue. The jury was faced with two mutually exclusive theories: the State's theory that Gonzales inflicted the complainant's injuries, or the defense theory that those injuries were self-inflicted. An individual juror would either have found that Gonzales committed the aggravated assaults or that he had not assaulted the complainant at all."); *Martinez*, 190 S.W.3d at 261 (defense impugned complainant's testimony and "did not attack the veracity of the complainant's outcry about one allegation in a

record, we conclude that appellant did not suffer actual, egregious harm as a result of the erroneous jury charge.  *See Warner*, 245 S.W.3d at 461-62.  We overrule appellant's second issue on appeal.

### Evidence related to K.T.'s grandfather

In his first issue, appellant contends that he was denied his right to confront and cross-examine witnesses against him when the trial court refused to allow him to question K.T. and her mother about whether K.T. had made an outcry against her grandfather, C.V.  *See* U.S. Const. amend. VI.  Appellant complains that the error was compounded when the trial court allowed the State to assert that K.T. never made an accusation against her grandfather and denied appellant the opportunity to present evidence to the contrary.  In his third issue, appellant argues that the State gave the jury the "false impression" that K.T. never made an outcry against her grandfather.

---

manner different from the other outcry"; court concluded that "an individual juror would either have found appellant committed the aggravated sexual assaults or that he had not sexually assaulted the complainant at all"); *see also Dixon v. State*, 201 S.W.3d 731, 735 (Tex. Crim. App. 2006) (failure to require State to elect offense did not lead to non-unanimous verdict when victim testified about "one sequence of events and merely answered that this sequence happened one hundred times, with all but one of those instances occurring at night"; court held that there was "no basis in the record for the jury to believe that one incident occurred during the day but that none occurred at night" and that "anyone who believed the complainant's allegations in any respect would believe that sexual assaults occurred at night"); *Sanchez v. State*, 209 S.W.3d 117, 124 (Tex. Crim. App. 2006) (defendant admitted to some of alleged behavior but argued that it "was not really of a sexual nature at all, or that, if it was of a sexual nature, it was not unwelcome, and/or that the appellant was not aware that it was unwelcome"; thus, charge that did not require findings that sexual conduct occurred and was unwelcome required reversal); *Mathonican*, 194 S.W.3d at 67 (charge error caused egregious harm where complainant testified that one of alleged assaults never occurred and defendant asserted that sexual encounter was consensual). *But see Clear*, 76 S.W.3d at 624 (holding that to agree with State that jury must have found victim to be entirely credible would be to step into jury's place and would violate defendant's right to a unanimous jury verdict of guilt).

10

Although we generally review evidentiary rulings for an abuse of discretion, constitutional issues are reviewed de novo. *Martinez*, 212 S.W.3d at 423. A trial court's evidentiary ruling may rise to constitutional levels if it excludes otherwise relevant and reliable evidence that is so vital to the case that its exclusion basically bars the defendant from presenting a defense. *Id.* (quoting *Wiley v. State*, 74 S.W.3d 399, 405 (Tex. Crim. App. 2002)).

> In weighing probative value against Rule 403 counterfactors, courts must be sensitive to the special problems presented by "alternative perpetrator" evidence. Although a defendant obviously has a right to attempt to establish his innocence by showing that someone else committed the crime, he still must show that his proffered evidence regarding the alleged alternative perpetrator is sufficient, on its own or in combination with other evidence in the record, to show a nexus between the crime charged and the alleged "alternative perpetrator."

*Wiley*, 74 S.W.3d at 406; *see* Tex. R. Evid. 403. Appellant argues that this case is distinguishable from *Martinez* because there was a nexus between "the abuse alleged by [K.T.] and the alleged alternative perpetrator, [C.V.], in terms of the outcry, the time the outcry was made. . ., and [C.V.'s] proximity to [K.T.]." We disagree.

The evidence about which appellant complains relates to a 1999 CPS investigation into whether K.T. had been sexually abused by her father or her grandfather, C.V. Appellant argued at trial that the evidence went to K.T.'s credibility and that her story about being abused by appellant was "concocted." He also argued that the report raised a question about whether a perforation in K.T.'s hymen was caused by abuse by her grandfather, not appellant.

The CPS report in question, which was not introduced into evidence except for the trial court's in-camera review, addressed allegations from October 1999 of physical and sexual abuse

11

of K.T. and her brother by their father and concerns that she and her brother might be at risk for sexual abuse by C.V.[6] The "risk assessment analysis" states in the background section that C.V. molested H.V. when she was a child and "attempted to sexually molest [K.T.] in the past." In November 1999, a caseworker interviewed K.T., who said that C.V. "touched her in a bad way" and then "started to become emotionally upset (crying)." The caseworker ceased the interview when K.T. got upset. About two weeks later, the caseworker interviewed K.T. again. The report states, "[K.T.] did not make an outcry of" sexual abuse, and recites that K.T. explained that while they were in the pool together, C.V. "swam underneath her and touched her on the bottom, but them [sic] back away [sic] when he realized what he did." K.T. was upset at her mother for "starting this situation." H.V., K.T.'s mother and C.V.'s daughter, told CPS that she had been sexually assaulted by C.V. when she was a teenager; she did not think C.V. had abused K.T., but she feared K.T. and her brother were at risk. C.V. denied molesting H.V., said she "makes up stories," and denied molesting K.T. The risk assessment concluded that K.T. "did not make an outcry and appeared to have a different . . . behavior when discussing good and bad touch." Because K.T. became upset during her initial interview and said that C.V. touched her "in a bad way," the assessment recommended an "unable to determine" outcome for the allegation of abuse by C.V. The caseworker recommended closing the case "with no further services" because K.T.'s father and stepmother had enrolled her in counseling and she "appears to be doing fine."

---

[6] The report seems to have been located and produced by CPS on the first day of trial, while the parties were conducting voir dire. The State made an earlier request for disclosure of relevant CPS records, but the record related to K.T.'s grandfather was for some reason not produced by CPS.

12

During opening statements immediately following voir dire, appellant said, "[W]hat [the prosecutor] didn't say was that [K.T.] made another outcry in 1999 that was her grandfather, [C.V.]" The State objected that there was "no evidence to that effect," and appellant responded, "Well, it is evidence that we just got, those records." The jury was excused, and the attorneys and trial court discussed the just-produced CPS records. The trial court ruled that "if I haven't determined what is admissible in them, you cannot use them yet. I have to review them to see if they are, because those aren't ordinarily discoverable at all." The court asked the attorneys to avoid referring to the records "because it may very well be that nothing in there is deemed to be admissible." The court said it would review the records that night and make a ruling.

The State then began to present its case, calling K.T. to testify first. On cross-examination, appellant asked whether K.T. recalled talking to CPS "at another time about anything that has happened to" her, and she answered, "No. I can't remember." Appellant asked the same question again, and the State objected that appellant was "trying to get into the records," and the trial court said, "I have already ruled on that we are not going to use the records until after I see them." Appellant ceased that line of questioning with the understanding that, depending on the court's ruling regarding the CPS records, he could further cross-examine K.T. later.

Before the jury was brought in the next morning, the trial court said it had reviewed the CPS records and ruled, "I don't find the areas that you-all have designated to be admissible, as of yet at least, so those matters should not be gone into without approaching the Bench at this point." The jury was brought in, and H.V. testified that she contacted a lawyer after her ex-husband, K.T.'s father, obtained custody of K.T. and her brother. She testified that when her ex-husband

13

spanked K.T.'s brother hard enough to leave bruises, she contacted a lawyer about regaining custody. H.V. was asked whether she made a CPS report at the same time, and she said she did not. The State then asked, "Do you know who did," and H.V. answered, "Yes, the lawyer did." Appellant objected that the question called for hearsay and that he did not know anything about H.V.'s lawyer. The State said it was seeking the testimony "to clarify the CPS report that [appellant] has been making reference to throughout this trial, despite the Court's ruling." The trial court refused to give a limiting instruction, and the State then asked whether H.V. told her lawyer that she was concerned about K.T.'s father bringing her around C.V. H.V. testified that she talked to her lawyer about her concerns and explained that she was worried because C.V. had molested her when she was a child. H.V. further testified that K.T. had not made an outcry that she had been abused by C.V. and that H.V. never saw anything that made her think C.V. had abused K.T. She agreed with the State that "in 1999, the report that went to CPS was just a series of the lawyer taking something you had said and turning it into something else" and said she thought the 1999 CPS report concerning C.V. was closed after CPS spoke to K.T. She also testified that when the police began to investigate K.T.'s allegations against appellant, she initially thought that K.T. might instead have been abused by C.V.

On cross-examination, H.V. said that C.V. had sexually abused her as a child; that to protect K.T. when they lived with C.V., she put a lock on K.T.'s door to stop C.V. from entering the room; and that K.T. was never locked in C.V.'s room with him. Appellant sought to question H.V. about the CPS report, and the trial court refused to allow it, saying that the report was inadmissible. Appellant argued that the timing of the report and the types of acts alleged against

14

appellant and against C.V. were similar. Appellant said that he might have to recall K.T., and the court responded, "It still won't matter. You won't be able to ask her about that. That incident is totally separate and apart, even if it's true." Appellant objected that the trial court's ruling violated his right to confront and cross-examine H.V.

Appellant called as a witness a friend who lived for a time with appellant, H.V., C.V., K.T., and K.T.'s brother and who testified that he frequently saw C.V. enter K.T.'s room and lock the door behind him. Appellant's mother testified that H.V. told her that she had been sexually abused by C.V. Finally, K.T.'s stepmother, who heard K.T.'s outcry and urged her to seek counseling and report the abuse, testified that she believed K.T. was a habitual liar who did not know truth from fiction and who was a selfish and "very, very sexual child."

We hold that the trial court did not err in refusing to admit the CPS report or in barring appellant from questioning K.T. and H.V. about whether K.T. was touched in a "bad way" by C.V. We acknowledge that the jury sent a note asking whether H.V. told appellant's mother that C.V. had abused H.V. or K.T. However, the CPS report concluded that K.T. had not made an outcry of sexual abuse and said that K.T. reported initially that C.V. touched her in a "bad way" and later explained that he touched her "on the bottom" accidentally. H.V. also testified that K.T. had not made an outcry of abuse by C.V. and that H.V.'s lawyer made the 1999 report.

The defense did not argue that K.T. was mistaken about who had abused her over a period of four or five years. And, as the trial court noted, even if C.V. had abused K.T., that would not bear on whether appellant also abused her. Appellant has not established a connection between C.V. and the abuse K.T. alleged. *See Martinez*, 212 S.W.3d at 423-24. Even if all of the statements

15

in the report were true, they would amount to no more than "unsupported speculation" that K.T.'s grandfather, and not appellant, had abused K.T. as she testified. *See Wiley*, 74 S.W.3d at 406-07.

In his third issue, appellant argues that the State falsely stated that K.T. had never made an outcry against C.V. and that this impaired appellant's defense.

As discussed earlier, the trial court barred appellant from introducing the 1999 CPS report that said both that K.T. said C.V. touched her "in a bad way" and that K.T. denied being sexually abused by C.V. The CPS report was closed with an "undetermined" finding. H.V. and K.T. denied making a CPS report in 1999, and H.V. explained the circumstances under which her lawyer made the report. Therefore, there was no false testimony admitted. Nor did the State make a false statement in saying "[t]here was no outcry from" K.T. against C.V. in 1999. Thus, the State did not "actively mislead" the jury.

Finally, even if there had been error in the trial court's decisions related to the CPS report, on the basis of this record, there is no reasonable likelihood that it affected the judgment of the jury. *See Rubio v. State*, 241 S.W.3d 1, 3 (Tex. Crim. App. 2007). H.V. testified about the making of the report, stating that K.T. never made an outcry against C.V., and K.T. denied making a report to CPS. Appellant introduced evidence that C.V. locked himself in K.T.'s room with her and that H.V. was abused by C.V. when she was a teenager, and he cross-examined H.V. about her father's conduct when the family lived together. We overrule appellant's first and third issues.

## Limiting Instruction

In his fourth issue, appellant argues that the trial court should have given a limiting instruction when the State elicited improper extraneous-offense evidence. He specifically attacks:

16

(1) K.T.'s therapist's testimony that K.T. said she feared that appellant might hurt or "become sexually active" with other children in retaliation if K.T. reported his abuse, and (2) H.V.'s testimony that appellant was verbally and physically abusive to her during their relationship. Appellant contends that the evidence adversely affected his substantial rights.

With regard to K.T.'s therapist, she testified that K.T. feared that appellant would retaliate in the future if she reported his abuse. Such testimony is not evidence of extraneous bad acts, which are defined as "other crimes, wrongs or acts" and are inadmissible to show that the defendant acted "in conformity therewith." Tex. R. Evid. 404(b). Thus, the court did not abuse its discretion in overruling appellant's objection to the therapist's testimony.[7]

As for H.V.'s testimony, the State asked how appellant's treatment of her changed over time, and H.V. said without any objection by appellant, "At first, it was verbally abusive, and then it became physical." When the State followed up, asking, "And when you say physical, how physical," appellant asked whether the State had given notice of "any of this stuff." The prosecutor stated that she thought it had been disclosed but then withdrew the question. Appellant asked the

---

[7] On appeal, appellant contends that the trial court erred "when it refused to give a limiting instruction." However, at trial, appellant did not request an instruction. Instead, he objected to the therapist's "interject[ion] of extraneous offenses," but when the State pointed out that the therapist was testifying to what K.T. feared *might* happen, he said, "I thought she said that that's what she was claiming had happened." The State then took the therapist on voir dire to inquire into whether she knew whether appellant had hurt other children. When the therapist testified that she had no such knowledge, the State responded, "Then never mind; I am not going to go into" whether K.T. told the therapist that appellant had broken K.T.'s brother's arm. Appellant did not request a limiting instruction and he seems to have abandoned his complaint related to the therapist's statement about K.T.'s fears about what appellant might do to her family members if she reported his abuse.

17

trial court to instruct the jury to disregard H.V.'s answer, the trial court said, "She hasn't answered it yet," and appellant said, "Oh, okay, she hasn't. All right."

We hold that appellant has not preserved a complaint about H.V.'s statement that appellant verbally and physically abused her because he did not object to the State's question or H.V.'s answer. *See* Tex. R. App. P. 33.1(a)(1). Not until the State's follow-up did appellant object, and then he seemingly abandoned his request for a limiting instruction, agreeing that H.V. had not yet answered the question. Further, even if the trial court had erred in refusing the requested instruction, in light of the record and the brevity of H.V.'s statement, which was not revisited, the error would be harmless. *See* Tex. R. App. P. 44.2(b). We overrule appellant's fourth issue.

### Hearsay Evidence

In his fifth issue, appellant asserts that the trial court "erred in admitting hearsay evidence . . . for statements made in the course of treatment," attacking testimony by K.T.'s therapist about what K.T., her stepmother, and her father told the therapist in the course of her work with K.T.

When K.T.'s therapist was asked what she was told was the "presenting problem" that K.T. and her family wanted to work on, appellant objected to "hearsay and denial of confrontation" because K.T.'s father and stepmother were not present for cross-examination. The trial court overruled the objection, and the therapist answered that in the first therapy session, she was told K.T. was not doing well in school. Appellant asked for a running objection "about saying what [K.T.'s father and stepmother] said. I do have [K.T.] on recall." The trial court granted the request for a running objection. Thus, appellant preserved error only as to statements about what

18

K.T.'s father and stepmother told K.T.'s therapist. Further, appellant points to no specific statements by K.T. to her therapist and thus has waived any error related to such testimony. *See* Tex. R. App. P. 38.1(h).

As for whether the trial court should have barred the therapist from discussing what K.T.'s father and stepmother told her, appellant points to no specific testimony by K.T.'s therapist in almost ninety pages of the record, citing only pages "RR7-95" and complaining about "extensive hearsay evidence" and "hearsay statements of family members made during the course of family therapy." This failure to cite to the record waives any error. *See* Tex. R. App. P. 38.1(h); *Young v. State*, 242 S.W.3d 192, 199 (Tex. App.—Tyler 2007, no pet.); *Nguyen v. State*, 177 S.W.3d 659, 669 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd).

Further, K.T.'s therapist testified that during the second therapy session, K.T.'s father and stepmother told her that K.T. had told her stepmother that appellant had molested her but asked her stepmother not to report the abuse because she feared appellant would hurt H.V. or K.T.'s step-siblings. The therapist testified that the information "added a lot of detail to what work needed to be done in treatment." Other than that those statements, the rest of the therapist's testimony explained the therapy process and why it took K.T. several months to agree to report the abuse and described K.T.'s family's dynamic and conflicts. We find no "extensive" hearsay and hold that the trial court's decision to allow the therapist's testimony fell within the zone of reasonable disagreement. *See Ware v. State*, 62 S.W.3d 344, 350-51 (Tex. App.—Fort Worth 2001, pet. ref'd) (not error to allow therapist's testimony about information about child given by grandmother in course of treatment). Even if there were error, it would have been harmless in light of the record as

a whole and the extensive testimony provided by K.T. and rebuttal testimony presented by appellant in an attempt to show K.T. was untruthful. *See Motilla v. State*, 78 S.W.3d 352, 357-59 (Tex. Crim. App. 2002). We overrule appellant's fifth issue.

## Conclusion

Having overruled appellant's five issues, we affirm the judgments of conviction.

_____

David Puryear, Justice

Before Chief Justice Law, Justices Puryear and Henson

Affirmed

Filed:  December 18, 2008

Publish