

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-13-00187-CR

BELINDA BARROW                                                    APPELLANT

V.

THE STATE OF TEXAS                                                    STATE

----------

FROM THE 297TH DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 1314019R

----------

### MEMORANDUM OPINION[1]

----------

## I. INTRODUCTION

Appellant Belinda Barrow appeals her conviction for aggravated robbery. In two issues, Barrow argues that her right to a unanimous verdict was violated and that the trial court erroneously included a deadly weapon finding in its

---

[1]*See* Tex. R. App. P. 47.4.

judgment.  We will modify the judgment to delete the deadly weapon finding, and we will affirm the trial court's judgment as modified.

## II. BACKGROUND

It is undisputed that on August 27, 2011, Barrow walked along a hallway of the Normandale Place Apartments in Fort Worth, which is a retirement community, where she entered the apartment unit of eighty-three-year-old JoAnn Britton and stole property.  Because of what Britton reported to the police, the State charged Barrow with two counts of aggravated robbery.  Count one of the indictment alleged that Barrow committed aggravated robbery by threatening Britton with a gun, and count two of the indictment alleged that Barrow committed aggravated robbery by causing bodily injury to a person sixty-five years of age or older.  *Compare* Tex. Penal Code Ann. § 29.03(a)(2) (West 2014) *with* Tex. Penal Code Ann. § 29.03(a)(3)(A) (West 2014).

At trial, Britton testified that on August 27, 2011, she was sitting in her recliner when a black female "banged" her way into Britton's apartment.  Britton said that the woman, later identified as Barrow, "had a gun in her hand."  Britton described the gun as "a little pistol," stating that "[i]t wasn't very big."  According to Britton, the slight size of the pistol was "the first thing [she] noticed."  Britton said that as Barrow began to look around, she told Britton not to move or that she would shoot her.  Britton averred that after Barrow rummaged through the bedroom, she came back to the living room, took Britton's "wedding rings" off her fingers, and then left, slamming the door.  Specifically to Barrow's removing her

2

wedding rings, Britton said that Barrow had "squeeze[d]" her and then, after briefly letting go, Barrow instructed Britton to hold her hand out so that she could forcefully remove the rings from Britton's finger. Britton said that Barrow gave back her "wedding band," declaring "that's too little, I couldn't get nothing for that." Barrow, however, kept a ring that Britton said was gold and contained diamonds. Britton said that when Barrow removed the rings, "it hurt."

Britton's neighbor, Roger Dale McMann, testified that on that day he heard a "big pounding" on his door. McMann said that the pounding caused him to jump up and immediately answer the door. It was Britton who was pounding. McMann said that upon opening the door, Britton said, "[A] big black lady just pulled a gun on me and robbed me and took . . . my wedding rings off and went down the hall." McMann said that Britton pulled on her finger as she told him this, simulating having a ring pulled from her hand. He also said that Britton was shaking "[a]ll over" and that despite being her neighbor for some time, he had "never seen her that shook up before." McMann recalled that Britton told him that because she was unable to take her rings off "fast enough," Barrow "pulled the rings off" her finger. According to McMann, after attempting to follow Barrow, he returned to Britton, who was now in her own apartment.

McMann then called 9-1-1. The State introduced a recording of McMann's 9-1-1 call. In the recording, McMann can be heard telling the 9-1-1 operator that Barrow had a gun. Britton can also be heard in the background stating that Barrow had a gun.

3

McMann said that the condition of Britton's apartment was in disarray and that "[e]verything in her living room shelf was piled in the floor." McMann further averred that "there was a bunch of jewelry boxes and stuff dumped on the floor at the bottom of [Britton's] bed." According to McMann, Britton then again told him what had happened in more detail:

> [Britton] said the lady come in, pointed a gun at her, and said, sit right there, bitch. And then first she went over and went through the shelf. Then she went in and went through the jewelry boxes in the bedroom. Then she come back and said, stick out your hand. And JoAnn stuck out her hands, and she took JoAnn's rings off.

McMann also testified that the apartments that he and Britton lived in were clearly marked and known as a retirement community and that people referred to them as "the old folks' home."

Officer Matthew Pearce of the City of Fort Worth Police Department testified that he responded to a "home invasion" call on August 27, 2011. By Pearce's account, when he arrived at her apartment, Britton was "visibly upset," and her hands were injured. Pearce said that it appeared to him that someone had "rummaged through" Britton's jewelry box and that "various items" had been moved. Pearce said that he recorded in his report that Britton said to him that Barrow had a gun and that Barrow had said to her, "Don't move, bitch." Britton also told Pearce that Barrow had come "over to her and took the rings off of her fingers." Contrary to McMann's testimony, Pearce also recorded in his report that Britton said that Barrow never raised the gun or pointed it at her.

4

The State introduced, and published to the jury, a picture of Britton's hands. Pearce said that the picture was taken days after the incident but that it accurately depicted the state of Britton's hands at the time he arrived at her apartment. Pearce also testified that he and other investigators learned that the apartments had a surveillance system that had captured video of Barrow entering and leaving Britton's apartment. The State introduced and published for the jury a video which depicted Barrow walking through the halls of the retirement complex, knocking on doors, and seemingly attempting to open several doors. The video further depicts Barrow going into Britton's apartment and eventually exiting with a purse in her hand. From there, Barrow can be seen running to an exit stairwell. Pearce said that the video corroborated Britton's description of Barrow and Britton's account of what occurred. Pearce also said that Barrow's actions in the video were consistent with someone who was attempting to conceal a firearm in her waistband.

Fort Worth Police Detective Felicia Yates testified that she began to investigate these matters by watching the surveillance video. Yates said that the video allowed investigators to gain a very clear picture of Barrow, that Barrow's entry into Britton's apartment unit appeared to be a random invasion, and that Barrow could be seen in the video "jiggl[ing] lots of doors" in an attempt to find an accessible apartment unit to invade.

Yates also said that Barrow's action in the video of continually clinging to her waistband was consistent with someone who had secreted a gun in her pants

and was attempting to hold her pants up against the weight of the gun pulling her pants down. Further, through the use of an illustrative image from the surveillance video, Yates testified that Barrow could have had a gun in her waistband and that it was still possible for her to, from time to time, not hold her waistband as she attempted to enter an accessible apartment unit. Yates also said that given the nature of Barrow's invasion, in her experience, it would not be unusual for a person attempting to commit the type of theft Barrow allegedly committed to carry a weapon of some type. According to Yates, Barrow can also be seen carrying a purse out of Britton's apartment as she fled.

Yates further averred that she interviewed Britton and that Britton's answers to questions regarding the incident were consistent with what she had told Pearce. Yates said that the video corroborated Britton's description of Barrow. According to Yates, Britton's age and the fact that Britton had said that Barrow displayed a weapon during the incident caused investigators to categorize this event as an aggravated robbery. Yates said that Britton was unwavering in her statement that Barrow had a gun.

Yates averred that her investigation revealed that Barrow lived near the retirement community and that Barrow frequently pawned items at a nearby pawn shop. Through this information and information obtained through Crime Stoppers, police eventually located Barrow and brought her to the police station for questioning.

After reading *Miranda* warnings, Yates interviewed Barrow. The State introduced a video of the interview and played it for the jury. In the interview, Yates can be seen presenting evidence to Barrow about her having gone into Britton's apartment. Barrow can be heard saying, "I can't deny that." Barrow can also be heard stating that she would "give it back" and that she would swear that what she took was not a wedding ring. At other times, Barrow can be heard stating that she did not take any jewelry. Yates averred that Barrow's comments in the interview also led her to believe that Barrow knew that police were looking for her in connection with the Britton home invasion and that Barrow had been purposely avoiding the police. Barrow can be heard in the video stating that people had questioned her about her involvement in the robbery because of posted photographs from the surveillance video.

Barrow also testified at trial. Barrow admitted that she had gone "door to door" in the retirement center looking for one that was open. She testified that she had done so because she was unemployed. Barrow also said that she had several family members living with her at the time and had fallen on financial hard times. Barrow further testified that she "was stressed out" and "not thinking" when she entered Britton's apartment. Barrow, however, denied having a gun.

Barrow averred that the reason she was pulling on her waistband in the surveillance video was because she wore "baggy clothes, so that's what [she does] from time to time, [she'll] pull'em up." Barrow denied kicking in Britton's door and stated that she had entered Britton's apartment because someone had

7

said, "[C]ome in." Barrow said that she was there only briefly—just long enough to look around, grab Britton's purse, and leave. Barrow also denied having said anything to Britton or taking Britton's rings off of her finger. During cross-examination, the State introduced a photograph of Barrow's son, from his Facebook page, in which he is holding a small pistol. The Facebook post was from July 16, 2011—roughly one month prior to Barrow invading Britton's apartment.

Without objection, the trial court submitted a charge to the jury in which the State's counts of aggravated robbery while exhibiting a deadly weapon and aggravated robbery causing injury to an elderly person were in the disjunctive. The charge also included only one verdict form for aggravated robbery, which read: "We, the Jury, find the Defendant, [Barrow], guilty of the offense of aggravated robbery, as charged in the indictment." The charge also included an instruction on the lesser-included offense of theft. The jury foreman signed the general verdict form for aggravated robbery only. The jury sentenced Barrow to twenty years' confinement. The punishment verdict form also reflected that the jury had found Barrow "guilty of the offense of aggravated robbery as charged in the indictment." The trial court entered judgment accordingly. In its judgment, the trial court entered a deadly weapon finding. This appeal followed.

### III. DISCUSSION

#### A. Jury Unanimity

In her first issue, Barrow argues that the trial court erred by submitting the State's two theories of aggravated robbery to the jury in the disjunctive, thus violating her right to a unanimous verdict. Specifically, Barrow argues that the State's theories that she committed aggravated robbery by causing bodily injury to a person sixty-five years of age or older during the commission of a robbery and that she committed aggravated robbery by exhibiting a deadly weapon during the commission of a robbery should not have been submitted to the jury in the disjunctive. *Compare* Tex. Penal Code Ann. § 29.03(a)(2), *with* Tex. Penal Code Ann. § 29.03(a)(3)(A)*; see Cosio v. State*, 353 S.W.3d 766, 771 (Tex. Crim. App. 2011) (holding charge contained error when charge did not instruct jury that it must reach a unanimous verdict as to which specific criminal act the defendant committed); *Francis v. State*, 36 S.W.3d 121, 125 (Tex. Crim. App. 2000) (op. on reh'g) (holding trial court erred when it charged two acts of indecency with a child in the disjunctive for conviction on one count of indecency because the jury could convict on a less-than-unanimous verdict). Therefore, Barrow argues that we should reverse her conviction for aggravated robbery and remand this case to the trial court for a new trial. *See Tyson v. State*, 172 S.W.3d 172, 179 (Tex. App.—Fort Worth 2005, pet ref'd) (remanding for new trial after holding trial court's submission of four counts of sexual assault offenses to jury in the disjunctive was improper).

9

The State concedes this issue, but that does not conclude this court's duties. Even though the State's confession of error in a criminal case is important and carries great weight, we are not bound by it. *See Saldano v. State*, 70 S.W.3d 873, 884 (Tex. Crim. App. 2002); *see also Estrada v. State*, 313 S.W.3d 274, 286 (Tex. Crim. App. 2010), *cert. denied*, 131 S. Ct. 905 (2011). This Court must still independently examine the error confessed because "our judgments are precedents, and the proper administration of the criminal law cannot be left merely to the stipulation of parties." *Saldano*, 70 S.W.3d at 884.

We agree with both parties that the trial court erred by failing to require a unanimous verdict finding Barrow guilty of either aggravated robbery while exhibiting a deadly weapon or aggravated robbery by injury to an elderly person. We reach this conclusion in part based on the authority of *Ngo v. State*. 175 S.W.3d 738 (Tex. Crim. App. 2005). As the court of criminal appeals said in *Ngo*, "When the State charges different criminal acts, regardless of whether those acts constitute violations of the same or different statutory provisions, the jury must be instructed that it cannot return a guilty verdict unless it unanimously agrees upon the commission of any one of these criminal acts." *Id.* at 744.

We further base our holding on case law which treats injury and threat not merely as different means of committing a single robbery offense, but rather as entirely different offenses. *See Woodard v. State*, 294 S.W.3d 605, 608 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd) ("[T]he robbery statute provides two separate, underlying robbery offenses—robbery causing bodily injury and

10

robbery by threat."); *see also Gonzales v. State*, 191 S.W.3d 741, 747–48 (Tex. App.—Waco 2006, pet. ref'd) (aggravated assault by injury is "separate and distinct" offense from aggravated assault by threat); *Marinos v. State*, 186 S.W.3d 167, 175 (Tex. App.—Austin 2006, pet. ref'd) ("[A]ggravated bodily injury assault and aggravated assault by threat are different statutory offenses, not just two methods of committing the single offense of aggravated assault.").  But our review of Barrow's first issue does not stop with determining that the trial court erred in its jury charge.  We must also determine whether Barrow was harmed by the trial court's instruction.  *See Ruiz v. State*, 272 S.W.3d 819, 824 (Tex. App.—Austin 2008, no pet.) (conducting harm analysis after determining that trial court erred by giving jury instruction which violated defendant's right to unanimous verdict).

In this case, Barrow did not object to the jury charge.  Unpreserved charge error warrants reversal only when the error resulted in egregious harm.  *Nava v. State*, 415 S.W.3d 289, 298 (Tex. Crim. App. 2013); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g); *see* Tex. Code Crim. Proc. Ann. art. 36.19 (West 2006).  The appropriate inquiry for egregious harm is a fact-specific one that must be performed on a case-by-case basis.  *Gelinas v. State*, 398 S.W.3d 703, 710 (Tex. Crim. App. 2013); *Taylor v. State*, 332 S.W.3d 483, 489 (Tex. Crim. App. 2011).

In making an egregious harm determination, "the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence,

including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Almanza*, 686 S.W.2d at 171; *see generally Gelinas*, 398 S.W.3d at 708–10 (applying *Almanza*). Errors that result in egregious harm are those "that affect the very basis of the case, deprive the defendant of a valuable right, vitally affect the defensive theory, or make a case for conviction clearly and significantly more persuasive." *Taylor*, 332 S.W.3d at 490 (citing *Almanza*, 686 S.W.2d at 172). The purpose of this review is to illuminate the actual, not just theoretical, harm to the accused. *Almanza*, 686 S.W.2d at 174.

The charge in this case used the disjunctive in instructing the jury on the two ways Barrow could have committed aggravated robbery. Nowhere in the instruction did the court instruct the jury it must have been unanimous as to aggravated robbery while exhibiting a deadly weapon or unanimous as to aggravated robbery by bodily injury to an elderly person. The trial court did, however, verbally instruct the jury that when it had "reached a unanimous decision," it was to inform the court, but otherwise the trial court did not clarify a unanimity requirement. Thus, the state of the charge "weighs neither for nor against a finding of egregious harm." *Ruiz*, 272 S.W.3d at 825. But Barrow could have committed both types of aggravated robbery as alleged, and this weighs against a finding of egregious harm. *See Ngo*, 175 S.W.3d at 751–52 (reasoning that defendant could not have committed both crimes as alleged); *cf. Martinez v. State*, 212 S.W.3d 411, 421 (Tex. App.—Austin 2006, pet. ref'd)

12

(reasoning in part that because "it was possible for Martinez to both contact and penetrate the victim on separate occasions," failure to include unanimity requirement in charge was harmless).

The argument of counsel also supports that Barrow was not egregiously harmed by the court's instruction. *Ruiz*, 272 S.W.3d at 825 (reasoning that prosecutor's statement "it is sufficient if all of you agree that one or more of these ways have been proved" did not harm defendant despite charge's lack of unanimity requirement). Here, the State argued in its closing argument:

> Now, the important thing that you need to remember, first of all, about the charge is that both of those things are ways to commit aggravated robbery. You can believe that she had a deadly weapon and, therefore, is guilty under that count. Or you can believe that she robbed someone over 65 years of age and caused her bodily injury. You can believe that count. Or you can actually believe both of them to be true.

Later the State explained that the jury could find "one of these are true, or both." Still further, the State delineated the evidence supporting each of the different "ways to commit aggravated robbery." The State began its recitation of evidence that Barrow had used a deadly weapon by asking, "[F]irst of all, what evidence is there in this case that a firearm was used?" After describing the evidence supporting its theory that Barrow had a gun, the State then asked, "Now, what about the bodily injury?" Then the State delineated the evidence it had presented that Barrow caused injury to Britton during the invasion and theft. We conclude that the State's arguments weigh in favor that Barrow did not suffer egregious harm. *See id.*

13

Defense counsel's argument also delineated that aggravated robbery while exhibiting a deadly weapon and aggravated robbery by bodily injury to an elderly person are two distinct crimes. Indeed, defense counsel argued to the jury:

[Barrow is] not sitting back over here saying, well, let's see, she asked me about a gun, and I don't want to have a gun because that makes it aggravated robbery. Or if I injure somebody with bodily injury -- but bodily injury doesn't really mean hurting 'em bad, it just means that it hurts. But if I did that to somebody that's over 65 years old, then now it's an aggravated offense.

Thus, defense counsel's argument did not tend to cause injury to the jury's verdict. *Almanza*, 686 S.W.2d at 171.

And the state of the evidence leads us to believe that Barrow did not suffer egregious harm as a result of the trial court's error. The State presented copious amounts of evidence that Barrow both committed aggravated robbery while exhibiting a deadly weapon and aggravated robbery by bodily injury to an elderly person.

As to the deadly weapon, Britton testified that Barrow "had a gun in her hand" when she entered Britton's apartment. Britton described the gun as "a little pistol," stating that the small size of the pistol was the first thing that caught her attention as Barrow came in. The State introduced a picture that Barrow agreed was a picture of her son holding a small pistol. The picture came from her son's Facebook page and had been published on Facebook just prior to Barrow invading Britton's apartment. Britton's neighbor testified that she told him that Barrow had a gun. This statement is consistent with Pearce's report, in which he

14

recorded that Britton said that Barrow had a gun. In the 9-1-1 call, both Britton and McMann can be heard telling the operator that Barrow had a gun. And the two police officers that testified, Pearce and Yates, said that Barrow's actions in the surveillance-video footage were consistent with a person who had secreted a gun in her waistband. Yates further averred that in her experience, a person who commits the type of theft that Barrow committed normally would carry some type of weapon.

As to bodily injury to an elderly person, Britton testified that after Barrow rummaged through her bedroom, she came back to the living room, told Britton to hold out her hand, and forcibly took Britton's rings from her finger. McMann testified that in the immediate wake of the invasion, Britton had told him that Barrow had forcibly removed her rings. McMann said that Britton even pantomimed how Barrow had taken the rings from her finger. These statements were corroborated by both Pearce and Yates. Further, Britton said that when Barrow removed the rings, "it hurt." The State published to the jury photographs of Britton's hands that Pearce said were consistent with the condition of Britton's hands after Barrow invaded her apartment. The state of the evidence in this case leads us to conclude that Barrow did not suffer egregious harm. *See Cosio*, 353 S.W.3d at 777 (holding that defendant did not suffer egregious harm despite non-unanimity charge error where testimony detailed the various separate instances of criminal conduct). We hold that actual harm has not been shown and we cannot say that Barrow was denied a fair and impartial trial. *See id.* at

15

778. ("[I]t is logical to suppose that the jury unanimously agreed that Cosio committed all of the separate instances of criminal conduct."). We overrule Barrow's first issue.

### B.    Deadly Weapon Finding

In her second issue, Barrow argues that the trial court erred by entering a deadly weapon finding in its judgment when the jury made no express deadly weapon finding. The State agrees with Barrow, and so does this court.

An affirmative finding of the use or exhibition of a deadly weapon may be made

> when it is shown that a deadly weapon . . . was used or exhibited during the commission of a felony offense or during immediate flight therefrom, and that the defendant used or exhibited the deadly weapon or was a party to the offense and knew that a deadly weapon would be used or exhibited. On an affirmative finding under this subdivision, the trial court shall enter the finding in the judgment of the court.

Tex. Code Crim. Proc. Ann. art. 42.12, § 3g(a)(2) (West Supp. 2014).

When the factfinder is the jury, article 42.12 contemplates a two-step process. First, the jury makes an express, affirmative finding of fact that the defendant used or exhibited a deadly weapon in the course of committing the offense charged or in immediate flight from the commission of the offense. *See Johnson v. State*, 233 S.W.3d 420, 424 (Tex. App.—Fort Worth, pet ref'd); *see also Polk v. State*, 693 S.W.2d 391, 393 & n.1 (Tex. Crim. App. 1985). Second, when that affirmative finding is made by the jury, it then becomes the mandatory duty of the trial court to enter a separate and specific deadly weapon finding in

the judgment. *Polk*, 693 S.W.2d at 394. The term "affirmative finding" used in article 42.12 means an "*express* determination" by the factfinder that a deadly weapon was used or exhibited in the commission of the offense or in immediate flight therefrom. *Id.* at 393. It is not enough that a jury's general verdict might imply that a defendant had used a deadly weapon. *Lafleur v. State*, 106 S.W.3d 91, 95 (Tex. Crim. App. 2003). Rather, the use or exhibition of a deadly weapon must be a "necessary component" of the jury's verdict.[2] *Roots v. State*, 419 S.W.3d 719, 728 (Tex. App.—Fort Worth 2013, pet ref'd).

Here, as discussed above, even though it could be implied and it is logical to conclude that the jury found Barrow guilty of both aggravated robbery while exhibiting a deadly weapon and aggravated robbery causing injury to an elderly person, this implication is not sufficient to support the trial court's having entered its deadly weapon finding. *Lafleur*, 106 S.W.3d at 94–95. Further, the jury could have found that Barrow was guilty of aggravated robbery causing injury to an elderly person only and thus a deadly weapon finding was not a "necessary component" of the jury's verdict. *Roots*, 419 S.W.3d at 728. Therefore, we sustain Barrow's second issue.

---

[2]Because parole eligibility is determined on "flat time" alone without consideration of good time for a conviction where a deadly weapon has been used or exhibited, the statute was written to require entry of the finding in the judgment in order that the Texas Department of Criminal Justice could know from the judgment how to compute a defendant's date for parole. *Lafleur*, 106 S.W.3d at 94 (citing *Polk*, 693 S.W.2d at 393 n.1).

## IV. Conclusion

Having overruled Barrow's first issue and having sustained her second issue, we modify the trial court's judgment by deleting the deadly weapon finding and affirm the judgment as modified.

/s/ Bill Meier
BILL MEIER
JUSTICE

PANEL:  GARDNER, WALKER, and MEIER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  July 16, 2015

18