David Sidney HISEY, Appellant,

v.

The STATE of Texas, Appellee.

No. 01–02–00555–CR.

Court of Appeals of Texas, Houston (1st Dist.).

Jan. 8, 2004.

James Tucker Graves, Houston, TX, Roger L. Ezell, Galveston, TX, for Appellant.

B. Warren Goodson, Jr., Assistant District Attorney, Michael J. Guarino, Criminal District Attorney—Galveston County, Galveston, TX, for Appellee.

Panel consists of Chief Justice RADACK and Justices KEYES and ELSA ALCALA.

## OPINION

ELSA ALCALA, Justice.

Appellant, David Sidney Hisey, was charged by indictment with capital murder for intentionally or knowingly causing the death of Sunnye Hisey on or about November 15, 1999 and for intentionally or knowingly causing the death of Hollis Hisey on or about July 15, 2000 pursuant to the same scheme or course of conduct, but during different transactions. A jury convicted appellant of the lesser-included offense of murder and assessed punishment at 43 years' confinement and a $10,000 fine.

In his first point of error, appellant claims that the trial court erred by charging the jury in the disjunctive, which effectively permitted conviction for the lesser-included offense of murder without a unanimous verdict. In his second point of error, appellant claims that he was denied the opportunity to prove that the jury decided his punishment by lot, which deprived him of a new trial pursuant to rule 21.3(c) of the Rules of Appellate Procedure. We reverse and remand.

## BACKGROUND

Appellant lived with his parents, Sunnye and Hollis Hisey, in Galveston, Texas. Appellant grew up in Galveston and previously resided in Florida, but returned to the island around 1995 to care for his elderly parents, who were suffering from declining health. On September 1, 2000, responding to inquiries from concerned family and friends regarding the condition and whereabouts of the elderly couple, Investigator Bruce Balchunas and Detective Perry Larvin of the Criminal Investigation Division of the Galveston County Sheriff's Office met appellant at the Hisey residence. Appellant signed a consent form to allow the officers to search the residence. In a bedroom, the detectives discovered the partially decomposed bodies of Sunnye and Hollis Hisey. According to the Galveston Medical Examiner, both had been strangled to death. Following his arrest, appellant reached for a firearm in an attempt to kill himself, but was restrained by the police officers. While in custody, in a videotaped statement to police officers, appellant claimed that his parents died of natural causes.

## DISCUSSION

### Erroneous Jury Charge

■ In his first point of error, appellant contends that the trial court erred by permitting the jury to return a non-unanimous verdict on a lesser-included offense of murder in the guilt-innocence jury charge. The charge to the jury instructed that appellant should be found guilty of the lesser offense of murder if jurors found beyond a reasonable doubt that appellant either:

1. intentionally or knowingly caused the death of Sunnye Hisey *and* Hollis Hisey and the jury had a reasonable doubt whether the murders were committed pursuant to the same scheme or course of conduct; OR,

2. intentionally or knowingly caused the death of Sunnye Hisey, *but did not* cause the death of Hollis Hisey; OR,

3. intentionally or knowingly caused the death of Hollis Hisey, *but did*

*not* cause the death of Sunnye Hisey.

The verdict form provided the jury with three options: (1) guilty of capital murder as alleged in the indictment; (2) guilty of the lesser offense of murder; or, (3) not guilty. The murder option did not specify which of the three possibilities the jury relied on in reaching the verdict, namely, whether appellant was guilty of murdering both parents, his mother only, or his father only.

The Court of Criminal Appeals addressed the issue of disjunctive jury charges in *Francis v. State*, 36 S.W.3d 121 (Tex.Crim.App.2000). In *Francis*, the appellant was charged with a single count of indecency with a child. *Id.* at 122. The State's evidence, however, established two incidents in which Francis touched the victim's breasts and two incidents in which he touched the victim's genitals, but no incidents in which he touched the victim's breasts *and* genitals. *Id.* (emphasis added). The jury charge in *Francis* contained the following language:

> [I]f you find from the evidence beyond a reasonable doubt ... the Defendant ... did, engage in sexual contact by touching the breast *or* genitals of....

*Id.* at 124 (emphasis in original). Francis objected to the language "breasts *or* genitals" and requested the charge read "breasts *and* genitals." *Id.* at 123 (emphasis in original).

The Court of Criminal Appeals held that the *Francis* trial court erred by charging the jury in the disjunctive. *Id* at 125. The disjunctive charge made it possible for *Francis* to be convicted by a non-unanimous jury because the charge allowed the jury to convict him even if some of the jurors believed he touched only the victim's breasts while others believed he touched only the victim's genitals. *Id.* This possibility made it impossible for the reviewing court to ascertain for which offense of indecency with a child the jury had found Francis guilty. *Id.* The failure of the *Francis* trial court to require a unanimous jury finding of guilt resulted in a remand for a harm analysis. *Id.*

As in *Francis*, the jury charge in this case allowed the jury to convict appellant of murder whether some members of the jury believed appellant was guilty of murdering both his parents, or whether some jurors believed he murdered solely his mother or solely his father. *See id.* The murder of Sunnye Hisey is one offense, and the murder of Hollis Hisey is a different offense. Yet, the charge allowed for conviction of murder if appellant committed either offense and thereby allowed for the possibility of a non-unanimous jury verdict of murder. It is impossible for us to ascertain for which offense the jury convicted appellant. Although it is entirely possible that some of the jurors may have believed appellant was guilty of the murder of both his parents, it is also possible that appellant was convicted of murder by six jurors who believed he was guilty of murdering only his mother and six jurors who believed he was guilty of murdering only his father. As written, the charge allowed for a non-unanimous jury verdict, in violation of the Texas Constitution's and Texas Code of Criminal Procedure's requirements of a unanimous jury verdict in felony cases. *See Francis*, 36 S.W.3d at 125; Tex. Const. art. V § 13; Tex.Crim. Proc.Code. Ann. § 36.29(a) (Vernon Supp. 2004). We conclude that the trial court erred by not requiring the jury to return a unanimous verdict as to one of the three theories of committing the lesser-included offense of murder.

**Harm Analysis**

■ Having found error in the jury charge, we must now determine whether the error was harmful enough to require

reversal. *See Abdnor v. State*, 871 S.W.2d 726, 731–32 (Tex.Crim.App.1994). The degree of harm required for reversal turns on whether appellant preserved error in the trial court. *See id.* at 732. An appellant who timely objects to the charge preserves error for review, and reversal is required only on the finding of "some harm." *Id.* at 732. The burden is higher if an appellant did not object to the charge. When an appellant does not preserve error, we may not reverse unless appellant suffered "egregious harm." *Id.*

■■■ When an appellant has failed to object to an erroneous disjunctive jury charge, an appellate court applies the *Almanza* egregious-harm standard, which requires reversal only if the error was so harmful as to deprive the appellant of a fair and impartial trial. *See Clear v. State*, 76 S.W.3d 622, 623–24 (Tex.App.-Corpus Christi 2002, no pet.) (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App. 1985)). To assess the degree of harm, we examine the following: (1) the entire jury charge; (2) the state of the evidence, including contested issues and the weight of the probative evidence; (3) the arguments of counsel; and (4) any other relevant information revealed by the record of the trial as a whole. *Almanza*, 686 S.W.2d at 171. Errors that result in egregious harm are those that affect "the very basis of the case," "deprive the defendant of a valuable right," or "vitally affect a defensive theory." *Hutch v. State*, 922 S.W.2d 166, 171 (Tex.Crim.App.1996) (citing *Almanza* 686 S.W.2d at 172). An appellate court must examine the relevant portions of the *entire* record to determine whether appellant suffered *any* actual harm as a result of the error. *Arline v. State*, 721 S.W.2d 348, 352 (Tex.Crim.App.1986). It is the appellant's burden to prove that he suffered some actual, rather than merely theoretical, harm from the error. *Dickey v. State*,

22 S.W.3d 490, 492 (Tex.Crim.App.1999) (citing *Arline v. State*, 721 S.W.2d at 351).

■■■ Appellant did not object to the jury charge; thus, reversal is *required only if* the error was so harmful as to deprive him of a fair and impartial trial. *See Almanza*, 686 S.W.2d at 172. The State contends that appellant did not suffer actual, egregious harm as a result of the disjunctive charge because the charge required the jury to agree unanimously upon one of the three lesser-included offenses of murder. We disagree. The charge did not specify that the 12 jurors had to be unanimous in their theory of the murder, but instead allowed for a conviction for murder even if jurors disagreed about which murder appellant committed.

■■■ The State further asserts that because the overwhelming weight of the evidence established that appellant was guilty of killing both his mother and father, he has suffered no actual harm as a result of the erroneous charge. We address the State's contention by applying an *Almanza* harm analysis to evaluate the degree of actual harm caused by the erroneous disjunctive jury charge. 686 S.W.2d at 172.

### 1. The Jury Charge

We begin our harm analysis by analyzing the jury charge itself. *See Almanza*, 686 S.W.2d at 171. The jury charge instructed the jury to find appellant guilty of capital murder if the evidence established beyond a reasonable doubt that he intentionally or knowingly caused the death of Sunnye Hisey and Hollis Hisey pursuant to the same scheme or course of conduct, but during different transactions. There were two differences between the jury charge for capital murder and the charge for the lesser offense of murder. First, the murder charge did not require the jury to find that the deaths were caused pursuant to the same scheme or course of con-

duct. Second, the erroneous murder charge allowed for a conviction if the proof established that appellant caused the death of either his mother or his father or both, unlike the capital murder charge, which required a finding that appellant caused both deaths.

We know from the jury verdict convicting appellant of murder that the jury believed appellant caused the death of at least one of his parents. We also know from the verdict that the jury either had a reasonable doubt concerning whether the deaths occurred during the same scheme or course of conduct, or whether appellant caused both Hiseys' deaths.

■ In assessing whether appellant was harmed by the erroneous jury charge, we also consider the appellate presumption that the jury is presumed to have understood and followed the court's charge, absent evidence to the contrary. *See Hutch,* 922 S.W.2d at 172. Under this presumption, we must presume that the jury followed the erroneous instruction, which authorized conviction for murder, even if the jurors disagreed whether appellant killed only Sunnye or only Hollis, as long as they unanimously agreed he killed either or both of them. *See id.* Moreover, the erroneous charge was contained in the application paragraph, the portion of the charge that authorizes the jury to act. *See id.* Nothing in the record suggests that the jury did not understand or follow the court's charge, and we must presume that it is possible that appellant was convicted by a jury that may have been split concerning whether he killed either Sunnye or Hollis. *See id.*

### 2. The Contested Issues

We must next examine the state of the evidence, including contested issues and the weight of the probative evidence. *See Almanza,* 686 S.W.2d at 171. There were two contested issues in the trial. First,

the parties contested whether the deaths occurred during the same scheme or course of conduct. Second, the parties contested whether appellant caused the deaths of both Sunnye and Hollis.

The State's theory that the murders occurred pursuant to the same scheme or course of conduct revolved around evidence that established that appellant stole approximately half a million dollars from his parents. According to the State, from 1995, when appellant began to assume the care of his elderly parents, until 1999, just before the death of his mother, appellant depleted the Hiseys' bank accounts. According to the State, appellant killed his mother in late 1999, because she was no longer of use to him and too difficult to care for, and killed his father at least eight months later, in mid–2000, for the same reasons. When friends or family members attempted to speak to the Hiseys, appellant would lie about their whereabouts. Additionally, appellant would borrow money from the Hiseys' friends and family under the guise that the Hiseys needed funds to pay their bills.

Appellant did not testify, but he did establish a defense from cross-examination of the State's witnesses and through defense witness testimony. Appellant did not dispute the evidence establishing that he was a thief and a liar, but nonetheless contended that there was no financial motive to kill his parents pursuant to any scheme or course of conduct. Appellant points to evidence that he had a power of attorney to handle the financial affairs of his father since 1999, and that he had already depleted the Hiseys' bank accounts by early 1999, before the death of either of the Hiseys. Moreover, appellant maintains that, if the motive were financial, there would be no reason for at least

an eight-month gap between the death of Sunnye and the death of Hollis.

The parties disagreed about why appellant did not bury his parents' bodies in a traditional manner. According to the State, appellant had to hide the bodies in order to maintain the appearance that the Hiseys were still alive so that he could continue to receive his mother's monthly social security checks and his father's bi-monthly retirement checks after their deaths. Appellant denied the financial motive for failing to bury his parents traditionally. He presented evidence of the Hisey "family plan" through Dr. Theodore Stubbs, a retired cardiologist. According to Dr. Stubbs, when he and appellant were friends in the ninth grade, appellant told him his "family plan" was to care for his parents, and, upon their deaths, to allow the deceased parents to remain in a bedroom rather than to provide for a traditional burial.

The parties also disagreed about the interpretation of appellant's attempted suicide. Although the State maintained that appellant's attempted suicide showed guilt over the killing of his parents, appellant maintained that the suicide could be related to his feelings of guilt about the thefts.

The evidence in the record reflects a dispute between the parties concerning whether the deaths were caused pursuant to the same scheme or course of conduct. Although evidence of the theft, evidence of the lies to the Hiseys' friends, family, social worker, and persons involved with Meals on Wheels, and evidence about the hiding of the bodies was not disputed by appellant, the interpretation of the evidence was hotly contested and subject to credibility assessments by the jury. The jury's note to the trial court during its deliberations, stating that it had a dispute about the meaning of the terms "course of conduct" and "same scheme," reflects that the jury was concerned with the issue. Because we cannot make the necessary credibility assessments from a cold record, we cannot determine whether the dispute concerning the issue of same scheme or course of conduct resulted in the acquittal of capital murder.

The second major area disputed by the parties concerned the issue of cause of death for Sunnye and Hollis. Because the jury convicted appellant of murder, we know that the jury was convinced beyond a reasonable doubt that he caused the death of Sunnye or Hollis. Because of the erroneous instruction in the charge, however, we do not know whether the jury was convinced that appellant killed both Hiseys, or whether it believed he killed only one of the Hiseys, and, if so, which one.

We review the medical evidence from the experts, three for the State and one for the appellant, to attempt to determine what the evidence established as the cause of death for Sunnye and Hollis. Dr. Charles Harvey, the Galveston County Medical Examiner, performed the autopsies on the bodies of Sunnye and Hollis. Dr. Stephen Pustilinik, the Deputy Chief Galveston County Medical Examiner, and Dr. Sparks Veasey, an Assistant Galveston County Medical Examiner, did not assist in the autopsy, but personally examined the neck organs taken from the bodies of the Hiseys after the organs were placed into a formalin solution. Appellant's expert, Dr. Lloyd White, a medical examiner in Nueces County, also examined the Hiseys' organs that were in the formalin solution and reviewed the autopsy report prepared by Dr. Harvey.

Much of the medical testimony was not contested. Sunnye was 85 years and Hollis was 91 years of age at the time of their deaths. Having been dead almost a year, Sunnye was in a decomposed state of mummification at the time of autopsy.

Having been dead for two to four months, Hollis was in an advanced decomposed state at the time of autopsy. The doctors agreed that the state of decomposition and the circumstances in which the bodies were found made the evaluation of the case difficult. Because of the state of decomposition, the external examination of Sunnye and Hollis at the time of the autopsy did not reveal signs of strangulation, such as visible marks on the neck or hemorrhages in the eyes.

There was no dispute among the experts concerning the many serious ailments that plagued Sunnye and Hollis. Sunnye had atherosclerosis, clinical hypertension, and Alzheimers disease at the time of her death. Hollis had chronic obstructive pulmonary disease, atherosclerotic coronary artery disease, with up to an 80 percent arterial blockage at the time of his death, pyelonephritis, and Alzheimers disease.

Although the opposing experts could agree on many of the medical findings, they could not agree about the cause of death. The State's three experts, Dr. Harvey, Dr. Pustilinik, and Dr. Veasey, each testified that the Hiseys were without a doubt killed by strangulation. The cause of death was described as obvious by the State's experts, but the appellant's expert, Dr. Lloyd White, testified that the cause of death for both Hiseys was most likely natural causes. According to Dr. White, Sunnye and Hollis died of atherosclerotic coronary artery disease contributing with the kidney infection and the lung disease. Although Dr. White admitted the circumstances of the deaths were suspicious, he noted that sometimes people leave their parents or their spouses in their homes after death simply for psychological reasons.

The medical evidence necessary to conclude that death was caused by strangulation appears to be an issue that was of concern to the jury during its deliberations. The jury sent a note stating, "There is a dispute on Dr. White's testimony as to reasons he would have to observe in order to rule strangulation in elderly/fresh bodies." In response, the trial court had the court reporter read back Dr. White's answer:

> "I would like to see a ligature around the neck if the body is severely decomposed. If the body isn't severely decomposed, I look for the kind of things that actually Dr. Harvey has quite aptly described. I look for marks on the skin. I look for hemorrhages in the muscle and soft tissue. I would look for fractures of the larynx of the hyoid bone. I would look for ingestion of the face and small petechial hemorrhages of the face and mucous membranes."

None of the signs of strangulation mentioned by Dr. White were present in the Hiseys' bodies, with the exception of fractures and hemorrhages described by the State's experts.[1]

The medical dispute concerned the fractures and hemorrhages discovered during the internal autopsy examination. The State's doctors testified that the Hiseys each had three fractures to their neck area caused by strangulation. However, appellant's expert contended that the findings of fractures to Hollis's neck could have been caused by the manipulation of the duct tape that was wrapped around his head. Hollis's body arrived at the morgue

---

1. Dr. Harvey testified that Hollis's head was darker than the chest and abdomen which could be due to blood trapped by strangulation. No explanation exists in the record to explain whether Dr. Harvey's findings conform to Dr. White's descriptions of anomalies in the face as "ingestion of the face and small petechial hemorrhages of the face" or if the head color is a different sign of strangulation not described by Dr. White in his testimony.

wrapped in two sheets, plastic casing, and duct tape. Appellant's expert challenged the findings of fractures on Sunnye by pointing to the original autopsy report which contained Dr. Harvey's conclusions that there were no fractures seen on Sunnye's larynx, a finding Dr. Harvey later amended to include mention of the fractures. In reply, the State contended that it would be highly improbable for three artifacts, fractures caused by manipulation of the bones during autopsy, to occur to two persons' necks who were recovered dead at the same location.

The jury appeared to be concerned with the issue of the possibility of artifacts caused by the removal of the organs during autopsy. The jury's note to the trial court during their deliberations stated, "There is a dispute as to the presence of Dr. Harvey during the initial removal of the voicebox and surrounding anatomy." In response to the note, the trial court allowed the court reporter to read back testimony from Dr. Harvey, who testified that he was substantially, but not absolutely, certain that he removed the organs of Sunnye and Hollis. Dr. Harvey admitted, however, that it could have been a morgue assistant who actually removed the organs.

The experts also disagreed about the interpretation of the evidence concerning hemorrhages in the neck area. During the autopsies, Dr. Harvey did not see any hemorrhages on either body, but did find mild hemoglobin staining surrounding Hollis's neck organs. Due to their decomposed state, Dr. Harvey had to re-hydrate the organs in the neck area of Hollis and Sunnye by placing the organs into a formalin solution to make the hemorrhages visible. About two days after the organs were placed into the formalin solution, Dr. Harvey and Dr. Veasey, each observed hemorrhages in the organs in the solution.

According to appellant's expert, however, it could not be said with reasonable medical certainty that the bodies of Hollis or Sunnye had hemorrhages, as opposed to discoloration due to decomposition. Moreover, according to appellant's expert, the re-hydration would not have caused a hemorrhage to appear that was not there previously. The State's experts, however, in rebuttal, disagreed by asserting that medical examiners routinely distinguish between hemorrhages during life versus death, even in decomposed bodies.

Every expert gave a different opinion about the significance of the disappearance of the "hemorrhage" in deciding whether there actually was a hemorrhage. According to Dr. Harvey, once the hemorrhages became visible, they only appeared temporarily for about two weeks, and he did not photograph or otherwise preserve them for future examinations. According to Dr. White, if the hemorrhages had been placed into a formalin solution, they should have remained preserved for his examination, which occurred approximately 10 months following the autopsies. Dr. Veasey explained that if the sample had been properly preserved, the hemorrhage would remain, but might have become discolored. However, Dr. Pustilinik testified that, "There is a limited time to view hemorrhage but not a limited time to view hemoglobin staining. If it was a true hemorrhage it should have remained in the formalin solution beyond a few days."

The State's experts disagreed about the importance of the hemorrhages in evaluating the fractures, and in reaching the ultimate conclusion of strangulation. All the experts agreed that "putrefaction of soft tissues may produce areas of discoloration that closely resemble hemorrhage, and in such cases the presence of laryngeal fractures assumes vital importance and any possibility of artifactual fractures must be

eliminated." Moreover, Dr. Veasey agreed that reasonable minds could differ concerning findings of hemorrhage in decomposed bodies—"one might say discoloration and one might say hemorrhage." Dr. Harvey also testified that he would not have expected hemorrhages to tissues if the fractures were artifacts. However, Dr. Veasey said that even without the hemorrhages, he would have ruled the cause of death as strangulation because of the fractures.

Appellant also made specific challenges to Sunnye's cause of death as strangulation. The doctors agreed that sphincter incontinence is quite common in strangulation victims. However, the evidence established that Sunnye's adult diaper was not soiled, even though she had contents in her stomach at the time of autopsy.

An evaluation of the medical evidence presented turns on a credibility assessment of the physicians, all of whom appear qualified from the cold record. The disputed testimony from the record establishes that the jury could have believed that the fractures were really artifacts caused at the morgue, as suggested by the absence of documentation of fractures in Sunnye's original autopsy report, or caused by the wrapping of Hollis's body. The jury could have believed that there were no hemorrhages, hemorrhages only on Hollis because he had mild hemoglobin staining initially and Sunnye did not, or that evidence of hemorrhages was unnecessary because of the fractures. Sunnye's adult diaper was soil-free, inconsistent with what is common in strangulation. There are too many variables, based on whom the jury found credible and how it evaluated the importance of the testimony, for us to conclude that the jury convicted appellant for both murders. From the medical evidence, it appears possible that one or more of the jurors believed appel-

lant killed Sunnye only, and one or more of the jurors believed he killed Hollis only, and reached a verdict of murder under the erroneous charge.

### 3. Closing Arguments

We next examine the arguments of counsel. *See Almanza,* 686 S.W.2d at 171. The closing arguments of the parties focused on their repeated themes in the trial. The State urged that appellant killed his parents when they became too difficult to care for and hid their bodies to maintain the appearance that they were still alive so that he could continue to steal their money. Appellant's guilt was self-evident by his suicide attempt following his arrest, according to the State.

Appellant urged that it would be unnecessary for him to kill his parents to steal from them because he had already depleted their bank accounts before their deaths. Moreover, appellant maintained that the Hiseys were elderly and very ill, that they passed away from natural causes, and, in accordance with the Hisey "family plan" established decades before their deaths, that they were kept in the Hisey home following their deaths.

The closing arguments do not provide any additional data to affect our decision concerning whether appellant was harmed by the erroneous jury charge.

### 4. Other information

Lastly, we address any other relevant information revealed by the record of the trial as a whole. *See Almanza,* 686 S.W.2d at 171. The jury deliberated slightly over seven hours before reaching a verdict and sent the three notes described above. The record reveals no other relevant information to assist us concerning our harm analysis.

### CONCLUSION

We reject the State's assertion that appellant has suffered no harm because the

overwhelming weight of the evidence established he was guilty of killing both his mother and father. Given the time period of at least eight months between the deaths of appellant's parents, the conflicting medical evidence between the State's and appellant's experts, the conflicting evidence establishing the reasons for the seclusion of the deceased parents in the bedroom, and the impossibility of a determination of which murder appellant was convicted of committing, we conclude that appellant suffered egregious harm by the court's charge, which allowed for conviction of murder based on a non-unanimous jury verdict. We cannot make the necessary credibility determinations from the cold record. After examining the entire jury charge, the jury verdict, the disputed and undisputed evidence, the weight of the probative issues, and the arguments of counsel, we conclude that the erroneous disjunctive charge deprived the appellant of a fair and impartial trial. *See Almanza v. State*, 686 S.W.2d at 172.

The right to a trial by jury in criminal matters is among those fundamental rights guaranteed by our Constitutions. *Hutch*, 922 S.W.2d at 174. Appellant was effectively deprived of his right to a trial by jury because the erroneous disjunctive jury charge allowed for a conviction of murder whether the jury believed appellant committed the murder of Sunnye or the murder of Hollis. *See Francis*, 36 S.W.3d at 125; *Hutch*, 922 S.W.2d at 171.

We sustain appellant's first issue. Because of our decision on the first issue, we need not address appellant's second issue.

We reverse the judgment of the trial court and remand for a new trial.