Opinion Issued August 20, 2009

 

 

 

 

 

 

 

 

 

 

 

 

 










 

In The

Court of Appeals

For The

First District of Texas

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



NO. 01-08-00517-CR

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



PETE MARIN, III, Appellant

 

V.

 

THE STATE OF TEXAS,
Appellee

 

 



On Appeal from the 268th District Court

Fort Bend County, Texas

Trial Court Cause No. 43885

 








 



MEMORANDUM OPINION

          Under
Texas Rule of Appellate Procedure 50, we withdraw our June 25, 2009 opinion,
substitute this opinion in its place, and vacate our June 25, 2009 judgment.  See
Tex. R. App. P. 50.

The State charged appellant Pete
Marin, III, with capital murder for intentionally causing the death of Jake
Horrocks, a child under age six.  See Tex.
Penal Code Ann. §§ 19.02(b)(1),
19.03(a)(8) (Vernon 2003).  A jury found
Marin guilty, and, as the State did not seek the death penalty, the trial court
imposed an automatic sentence of confinement for life.  Marin appeals, contending that the evidence
is legally and factually insufficient to support his conviction.  Specifically, Marin argues that the medical
testimony was legally and factually insufficient because the doctors who
testified at trial were not qualified to express an opinion about when Jake
suffered his fatal skull fracture.  We
affirm.

Background

The decedent, Jake Horrocks, was the
ten-month-old child of Marin’s former girlfriend, Jennifer Horrocks.  Jake, Horrocks, and her eight-year-old
daughter lived with Horrocks’s parents in Needville,
 Texas.  While Jennifer was pregnant with Jake, she began
a romantic relationship with Marin. 
Marin and Horrocks knew each other in elementary and high school, and
reconnected as adults.  Marin was
married, but he left his wife and children to move into the Horrocks’ home.  Horrocks and Marin ended their relationship
when Jake was about two months old, and Marin moved out of Horrocks’ home.

After Jake was born, Jake’s
grandfather, Bill Horrocks, cared for Jake while Horrocks and her mother were
at work.  Horrocks and her parents
testified that Jake was a happy baby who loved his mother, his older sister,
and his grandfather.  Jake was sometimes
shy around strangers, but he was generally friendly and liked people.  

In December 2005, when Jake was then
eight months old, Horrocks and Marin resumed their relationship.  Marin began to visit Horrocks at her home in
the early hours of the morning, around 3:00 or 4:00 a.m., two or three days per
week, to have sex.  Marin and Horrocks spent
this time in her bedroom, which she shared with Jake.  During these visits, Marin and Horrocks also
spent time talking or playing with Jake if he awoke.  

Marin told Horrocks that he was
interested in “bonding” with Jake, and he wanted to spend time alone with him
to facilitate the bonding.  At Marin’s
request, Horrocks regularly permitted Marin to take Jake out to his truck in
the driveway and spend fifteen to twenty minutes alone with Jake in the truck.

On February 23, 2006, when Jake was
ten months old, Marin visited Horrocks at her home around 3:00 or 3:30 a.m.  Horrocks performed oral sex on Marin, but she
was interrupted when Jake briefly awoke and then went back to sleep.  Shortly thereafter, Jake interrupted again,
and Horrocks fed him a bottle.  Jake was
groggy, but during his interactions with Horrocks and Marin, he laughed.  Marin told Horrocks that he wanted to spend
time alone with Jake, and Horrocks accompanied Marin and Jake out to Marin’s
truck.  Horrocks returned to the house
and gathered a few things she had purchased for Marin at the store.  She took those items out to the truck and gave
them to Marin.  Jake whined when Horrocks
returned and indicated that he wanted to go to her, but Marin asked for a few
more minutes with Jake, and Horrocks went back inside the house.  About ten minutes later, Horrocks heard a
loud noise that sounded like a car door slam followed by another loud noise.  She walked to the front door and opened
it.  Marin was standing in front of the
door holding Jake’s limp body in his arms. 
Marin told Horrocks that Jake was choking.  Horrocks called for her mother and then
called 9-1-1.

A police officer arrived at the home,
followed by the paramedics.  Horrocks
informed a paramedic that Jake was choking. 
The paramedic testified that Jake exhibited agonal breathing, taking
gasping breaths every fifteen seconds, and had blood and a milky white
substance coming from his nose and mouth. 
He delivered five blows to Jake’s back in an attempt to stop the
choking, but his condition did not improve. 
The paramedic then intubated and ventilated him to provide him with
oxygen.  Again, Jake’s condition did not
improve.  The paramedics secured Jake and
transported him by ambulance to Oak Bend Hospital
in Richmond.  In the ambulance, one paramedic administered
an IV to Jake, who did not respond to the pain of the needle insertion.  The paramedic testified that, even when
unconscious, children usually flinch from pain. 
Shortly after Jake’s arrival at Oak Bend, he was transported by
helicopter to Texas Children’s Hospital in Houston.

Upon arrival at Texas Children’s,
Jake was placed in the pediatric intensive care unit, where Dr. Jeanine Graf
was the attending physician in charge of the unit.  Dr. Graf had been a licensed physician for
approximately fifteen years and was certified in both pediatrics and pediatric critical
care.  She had worked in the pediatric
intensive care unit at Texas Children’s for eleven years, and she also worked
as an associate professor at Baylor College of Medicine, specializing in
critical care.   Throughout her career, Dr. Graf has treated hundreds,
if not one thousand, children with head injuries or neurological problems.  She has qualified as a testifying expert in
the state of Texas
on many occasions.

Dr. Graf testified that Jake was in
dire condition when he arrived at the hospital, and he showed no signs of brain
function.  Because his condition was unstable,
doctors were not able to perform a CT scan on Jake until about seven-and-a-half
hours after he arrived at the hospital. 
The CT scan revealed multiple skull fractures and a loss of the
grey/white matter distinction in Jake’s brain, which is consistent with a lack
of oxygen to the brain.  Dr. Graf
testified that one of these skull fractures was fresh, and that it was her
opinion Jake sustained a blow to the head, rendering him unconscious and unable
to breathe normally.  Jake then suffered
brain damage caused by a lack of oxygen. 
Dr. Graf opined that Jake would have become immediately symptomatic
after the injury was inflicted and would have not have appeared normal for any
time after the injury.  She stated that
it is not possible to time the loss of the grey/white matter distinction.   The
doctors determined that Jake was brain dead and removed him from life support
on February 24, one day after he arrived at Texas Children’s.

Dr. Graf also testified that Jake had
old fractures in two of his ribs, in his tibia, and in his skull.  The old skull fractures showed no signs of intercranial
bleeding and thus were not likely to have caused brain damage.  Dr. Graf reported these findings to Horrocks
and her parents.  She told the family
that Jake had old and new traumatic injuries that were consistent with child
abuse and that she would have to report it to the Texas Department of Family
and Protective Services.  Dr. Graf
testified that Horrocks and her parents were shocked and upset, and none of
them seemed to understand how Jake could have been abused.    

Dr. Graf testified that it would be
possible for a loving caregiver or doctor to miss signs of rib fractures, tibia
fractures, or skull fractures in a child who cannot speak and cannot walk.  Horrocks and her parents each testified that
they had not observed any signs of Jake’s injuries, and that Jake acted normal
and happy.  In January 2006, Horrocks
took Jake to the pediatrician for a bump on his head the size of the palm of her
hand.  At the time, Marin tried to
dissuade Horrocks from seeking care for Jake because the Department for Family
and Protective Services might get involved. 
Horrocks also testified that Marin mentioned to her that DFPS might take
his other children, even though no one had suggested at that point that Jake
had been abused.  The pediatrician told
Horrocks and her family that the bump was only a contusion and should recede on
its own, which it did.  

Dr. Rajesh Krishnamurthy is a
diagnostic radiologist at Texas Children’s who examined x-rays of Jake’s entire
body, after his doctors suspected that his injuries were not accidental.  Dr. Krishnamurthy specializes in diagnostic
imaging of children, or studying images that are taken for the purpose of
diagnosing injuries or illness.  Dr. Krishnamurthy
testified that Jake’s skull fracture showed no signs of healing, meaning it was
less than two days old.  Dr.
Krishnamurthy testified that Jake also had fractures in two of his ribs and in
his right tibia.  The location of Jake’s
rib fractures immediately raised a suspicion of non-accidental injury because
they were of the kind that are frequently inflicted by compressive force, such
as a person holding a child and squeezing him too tightly.  The fractures were non-displaced, which makes
them difficult to diagnose.  Jake’s tibia
fracture was a spiral fracture, which a child who is beginning to walk could
sustain in daily activities.  Dr.
Krishnamurthy testified that the tibia fracture would have been easier to
detect than the rib fractures because the child would most likely stop bearing
weight on his leg and would change his behavior accordingly.  If the child was not able to walk, however,
the tibia fracture could have been difficult to detect, although a caregiver
would be likely to notice the child’s response to pain when handling his leg.[1]  Because Jake’s fractures showed signs of
healing, Dr. Krishnamurthy testified that the rib fractures and tibia fracture
were at least two weeks old and maybe as much as eight weeks old.  

Dr. Paul Steinkuller is a pediatric
ophthalmologist at Texas Children’s.  Dr.
Steinkuller has been practicing pediatric ophthalmology since 1976 and has
worked as a professor at both University
of Texas Medical Branch in Galveston and Baylor
College of Medicine.  He has treated
thousands of children throughout his career. 
Dr. Steinkuller observed retinal hemorrhaging in Jake’s eyes.  Retinal hemorrhaging occurs when the blood
vessels inside the retinas break, and the retinas become covered in blood,
which can be caused by accidental or non-accidental trauma to the eyes or
head.  Dr. Steinkuller testified that
Jake’s retinal hemorrhaging was consistent with a blunt force head trauma,
which Jake could not have inflicted on himself. 
Jake’s hemorrhages were very severe, and Dr. Steinkuller testified that
it would have rendered Jake blind, which a caregiver should notice immediately.  Dr. Steinkuller testified that retinal
hemorrhages cannot be precisely dated but testified, with a reasonable degree
of medical certainty, that Jake’s hemorrhages occurred concurrent with his head
trauma.  Dr. Steinkuller testified that
he had never seen, nor was aware of any case in the literature, where a patient
with this type of retinal hemorrhaging was not immediately rendered
unconscious.

Dr. Roger Milton, an assistant
medical examiner in the Harris County Medical Examiner’s Office, performed an
autopsy on Jake’s body.  Dr. Milton has
been employed by the Medical Examiner for about ten years, and has performed
about seventy-five autopsies on children under the age of six.  Dr. Milton confirmed that Jake had fractures
in his ribs and his right tibia.  He
believed the tibia fracture was at least two months old because it was almost
completely healed.  The rib fractures
appeared to be ten to fourteen days old and were consistent with Jake’s body having
been squeezed too tightly.  Dr. Milton
also observed multiple fractures on the back of Jake’s skull in an eggshell-like
pattern, going in many different directions, which were healing.  Dr. Milton testified that he dated these
fractures as being ten to fourteen days old, like the rib fractures, but they
could have been older and coincided with the hematoma on Jake’s skull for which
he saw the pediatrician in January 2006. 
The older fractures were not associated with any bleeding or brain
damage.  The pattern of the eggshell
fractures was consistent with a compression injury, or someone having squeezed Jake’s
skull.

Jake suffered a four-inch, linear
fracture to the right side of his skull. 
Dr. Milton characterized the fracture as acute, meaning it had been
inflicted within two days, and as severe, requiring significant force to
inflict the injury.  Linear fractures are
caused by directional force hitting the head, such as an object striking the
head or the head being used to strike an object.    Here, Dr. Milton opined that Jake’s head
contacted a broad, yielding surface, as opposed to being hit with a narrow,
unyielding object.  Jake’s injury was a
rotational injury, consistent with a deep tissue brain injury, which causes an
incapacitation that can lead to immediate loss of consciousness, subsequent
brain swelling, and death.  Due to the
pattern of Jake’s head injury, Dr. Milton opined that Jake’s head struck a
surface that has the ability to deform or take the shape of the head, which
could include a dashboard, a steering wheel, the roof of a vehicle, a car seat
or headrest, the flat panel of the exterior of a vehicle, or even a person’s
body part like a palm or forearm.  Dr.
Milton explained that the softer the contact surface, the greater the force
necessary to cause this type of injury. 
Dr. Milton likened the amount of force necessary to inflict an injury of
this nature to the type of force one might sustain in a motor vehicle
crash.  This was more than the amount of
force a child of Jake’s size and weight would have been able to inflict on
himself.  Dr. Milton, like Dr. Graf,
observed a loss of the grey/white matter distinction in Jake’s brain.  He testified that generally, this loss does
not occur until ten to twelve hours after injury, but it is not possible to set
a precise time frame.

According to Dr. Milton, the force
necessary to cause Jake’s injury would likely have caused an immediate
neurological change, probably unconsciousness, possibly accompanied by agonal
or gasping breathing.  Dr. Milton
testified that the nature of Jake’s injury would have rendered him instantly
unconscious.  On cross-examination, defense counsel questioned Dr. Milton
regarding the nature of Dr. Milton’s previous statements to defense counsel
indicating that the injury could have occurred earlier and manifested itself at
a later point.  Dr. Milton testified that
he had previously believed that Jake showed earlier manifestations of his
symptoms, but he later changed his opinion. 
Dr. Milton testified that he changed his opinion after reviewing
Horrocks’s and Marin’s statements to the police about Jake’s behavior before he
became unconscious.

The defense called Dr. John Plunkett,
a forensic pathologist, as an expert to testify about Jake’s injuries.  Dr. Plunkett retired from hospital duties in
2004 and has since worked as a consultant, teacher, and writer in the field of
infant injury evaluation.  Dr. Plunkett
has published articles and letters in this field as well.  He has testified as an expert many times.  Dr. Plunkett reviewed Dr. Milton’s autopsy
report, the police investigative report, and Marin’s statement.  Like Dr. Milton, Dr. Plunkett determined that
Jake suffered respiratory arrest caused by an impact trauma to the skull, which
resulted in a brain injury.  Dr. Plunkett
described the skull fracture as acute, meaning that the injury had happened
within two or three days of Jake’s death, but the impact to Jake’s skull could
have caused either immediate unconsciousness from rapid brain swelling or
delayed unconsciousness from a slow development of brain swelling.  Dr. Plunkett testified that the size of
Jake’s fracture did not indicate the severity of the impact that caused the
injury.  

Dr. Plunkett completed a study on
“lucid intervals” in children with head injuries.  A lucid interval occurs when a child has a
head injury but appears normal for some time after the injury occurs and later
loses consciousness.  The children in Dr.
Plunkett’s study ranged from twelve-months to thirteen-years, and most
sustained their injuries from low-level falls off of playground equipment.  The children’s lucid intervals ranged from
five minutes to a couple of days.  Thus,
Dr. Plunkett opined that it was possible that Jake suffered gradual-onset
swelling in the brain accompanied by a lucid interval, and not instant
unconsciousness.  Thus it was possible
that Jake’s injury had occurred before he was alone with Marin in the truck, but
the onset of his symptoms was delayed until he was alone with Marin.  

Dr. Plunkett also noted that the loss
of the grey/white matter distinction in the brain that the treating doctors
observed in Jake usually does not occur until ten or twelve hours after
injury.  Jake’s CT scan, showing the loss
of the distinction, was taken only seven-and-a-half hours after he lost
consciousness while in the truck with Marin. 
Therefore, Dr. Plunkett suggested that the loss of the grey/white matter
distinction in Jake’s brain supported his conclusion that Jake’s injury occurred
before he was alone with Marin.  Dr.
Plunkett stated, however, that this was also only a suggestion and not entirely
reliable.  He told the jury that a recent
scientific study showed that some children lost this distinction before ten
hours had elapsed.  He also testified
that it is not possible to date retinal hemorrhages.  Ultimately, Dr. Plunkett testified that,
although Jake was probably a battered child, it was not possible to say with
reasonable medical certainty that Jake’s skull fracture caused an immediate
loss of consciousness.     

Discussion

Marin contends that the
evidence presented at trial was legally and factually insufficient to support
his conviction because the State failed to prove that Marin inflicted Jake’s
fatal head injury.  Marin also contends
that Dr. Graf and Dr. Steinkuller were not qualified to express opinions on the
timing of Jake’s injury, and their opinions that Jake immediately lost
consciousness after sustaining his head injury were unreliable.  

The trial court conducted
a Daubert hearing on Dr. Graf’s
qualifications to testify.  See Daubert v. Merrell Dow Pharm., Inc.,
516 U.S.
869, 116 S. Ct. 189 (1995); Jordan v.
State, 928 S.W.2d 550, 554 (Tex. Crim. App. 1996) (observing that Daubert standard is “virtually identical
to the one adopted by this Court”).  The Daubert hearing revealed that Dr. Graf
had fifteen years of experience as a licensed physician.  She had worked in the pediatric intensive
care unit at Texas Children’s for eleven years, and was certified in both pediatrics
and pediatric critical care, specializing in critical care, where she treated many
children with neurological injuries and illnesses.  She also worked as an associate professor at
Baylor College of Medicine, and had previously qualified as a testifying
expert.  The trial court allowed Dr. Graf
to testify 

…[A]s to her findings relative to her examination and
the history she took regarding Mr. Horrocks’s cause of death and the opinions
she established.  I think she is
qualified to do that.  What she has
testified to, in my opinion, doesn’t go into the child abuse area.  If she opines that it is child abuse, I will
not allow that.  But as to the timing and
the cause of death, I think that falls within her area of expertise, and I will
allow that testimony.

 

Texas Rule of Evidence 702 provides,

If scientific, technical, or other specialized
knowledge will assist the trier of fact to understand the evidence or to
determine a fact in issue, a witness qualified as an expert by knowledge,
skill, experience, training, or education may testify thereto in the form of an
opinion or otherwise.

 

Tex. R.
Evid. 702.  The trial court heard testimony that
qualifies Dr. Graf as an expert in pediatric injuries and their causes.  We hold that the trial court did not abuse
its discretion in finding Dr. Graf qualified to testify as to the cause of
Jake’s death.  See Tex. R. Evid.
702.

 
Trial counsel failed to object to any of Dr. Steinkuller’s testimony,
nor did he challenge Dr. Steinkuller’s credentials in a Daubert hearing.  We hold
that any challenges under Texas Rule of Evidence 702 to Dr. Steinkuller
qualifications or the admissibility of his opinions regarding the timing of
Jake’s injury are waived.  See Tex.
R. App. P. 33.1.  Once admitted,
we consider expert testimony together with all of the evidence admitted in the
case, to determine whether it is legally sufficient to support the jury’s
implied finding as to cause of death.  We
thus consider whether the lay and expert testimony in this case is legally and
factually sufficient to support the jury’s finding that Marin caused Jake’s
fatal skull fracture.

When evaluating the legal sufficiency
of the evidence, we view the evidence in the light most favorable to the
verdict and determine whether any rational trier of fact could have found the
essential elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99
S. Ct. 2781, 2789 (1979); Drichas v. State, 175 S.W.3d 795, 798 (Tex.
Crim. App. 2005).  The standard is the
same for both direct and circumstantial evidence cases.  King v. State, 895 S.W.2d 701, 703
(Tex. Crim. App. 1995).  We do not
resolve any conflict of fact, weigh any evidence, or evaluate the credibility
of any witnesses, as this was the function of the trier of fact.  See Dewberry v. State, 4 S.W.3d 735,
740 (Tex. Crim. App. 1999); Adelman v. State, 828 S.W.2d 418, 421 (Tex.
Crim. App. 1992); Matson v. State, 819 S.W.2d 839, 843 (Tex. Crim. App.
1991).  

When evaluating factual sufficiency,
we consider all the evidence in a neutral light to determine whether the jury
was rationally justified in finding guilt beyond a reasonable doubt.  Watson v. State, 204 S.W.3d 404, 414 (Tex.
Crim. App. 2006).  We will set the
verdict aside only if (1) the evidence is so weak that the verdict is clearly
wrong and manifestly unjust or (2) the verdict is against the great weight and
preponderance of the evidence.  Johnson
v. State, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000).  Under the first prong of Johnson, we
cannot conclude that a verdict is “clearly wrong” or “manifestly unjust” simply
because, on the quantum of evidence admitted, we would have voted to acquit had
we been on the jury.  Watson, 204 S.W.3d at 417.  Under the second prong of Johnson, we
cannot declare that a conflict in the evidence justifies a new trial simply
because we disagree with the jury’s resolution of that conflict.  Id.  Before finding that evidence is factually
insufficient to support a verdict under the second prong of Johnson, we
must be able to say, with some objective basis in the record, that the great
weight and preponderance of the evidence contradicts the jury’s verdict.  Id.  

At trial, the jury heard lay and
medical testimony regarding the cause and timing of Jake’s injuries from
multiple witnesses.  Marin contends that
the State failed to prove that Jake’s injury rendered him unconscious immediately—Jake
indisputably suffered head trauma, but the timing of the injury is at issue.

According to Dr. Milton, the type of
force that struck Jake’s skull was likely to cause immediate neurological
changes, including loss of consciousness. 
He believed it was very unlikely that Jake could have suffered the head
injury at an earlier time, appeared normal afterward, and then degraded from
neurologically normal to comatose in a period of thirty seconds.  Dr. Milton agreed that, generally, the loss
of the grey/white matter distinction in the brain, as seen in Jake, does not
manifest itself until about twelve hours after the injury, but that this time
frame is variable, depending on the severity of the injury and the amount of swelling
and lack of oxygen to the brain.  Dr.
Milton testified that he believed with reasonable medical certainty that the
onset of Jake’s unconsciousness occurred immediately after his injury.  This matches other facts adduced at
trial—that Jake was conscious and laughed just prior to Marin’s taking him to
the truck.  Only after that time did Jake
exhibit “choking” symptoms and bleeding into his eyes and mouth.

In contrast, Dr. Plunkett testified
for the defense that he believed it was possible that Jake could appear
neurologically normal after his injury, but then slowly deteriorate and become
unconscious.  Dr. Plunkett opined that
the loss of the grey/white matter distinction in the brain suggested that the
injury could have occurred earlier, but qualified that the loss of this
distinction can appear earlier than the generally accepted ten-to-twelve-hour
time frame, and that this time frame is only a suggestion, not a certainty.

Marin attacks the testimony of the
State’s expert witnesses, arguing that none of the medical experts expressed
their opinions in terms of reasonable medical certainty.  Marin further argues that Dr. Milton’s
testimony is legally insufficient because he failed to exclude the possibility
that Jake’s head injury occurred before he was in Marin’s exclusive care.  

We disagree.  It is unnecessary for the circumstances to
exclude, to a moral certainty, every feasible hypothesis, if a cause of death can
be determined with reasonable medical certainty.  See Turro
v. State, 950 S.W.2d 390, 397 (Tex.
App.—Fort Worth 1997, pet. ref’d), citing Carlsen
v. State, 654 S.W.2d 444, 447 (Tex. Crim. App. 1983).  In Turro,
the defendant contended that the complainant died as a result of drowning, whereas
the medical examiner, based on his autopsy of her body and other circumstantial
evidence, testified that the victim was manually strangled before she entered
the water.  Id.  The medical examiner conceded that his
opinions about the time and cause of the victim’s death were not absolute and
that he could not entirely eliminate a possibility that she had died from an
accidental drowning.  Id.  The court of appeals concluded that proof
beyond a reasonable doubt need not be proof beyond all doubt, and that the
evidence in the case was consistent with the theory that the victim was
strangled.  Id.  

Here, legally sufficient evidence
supports the jury’s finding beyond a reasonable doubt that Marin inflicted
Jake’s head trauma, causing his death.  An
evaluation of the medical evidence turns on the credibility assessment of the
testifying experts.  See Hisey v. State, 129 S.W.3d 649, 658 (Tex.
App.—Houston
[1st Dist.] 2004, pet. dism’d).  The jury
was free to believe Dr. Milton’s testimony that Jake’s injury rendered him
immediately unconscious because the record contains underlying facts supporting
his conclusion.  First, the fracture was
severe, causing retinal hemorrhaging and bleeding from the nose and mouth.  The ophthalmologist, Dr. Steinkuller,
testified that this sort of bleeding into the eyes would happen at the time of
the trauma.   Second, Marin was the only
person with Jake during the fifteen to twenty minutes before he became
symptomatic.  Horrocks, from inside the
house, heard two loud bangs before Marin brought Jake inside.  Third, Horrocks testified that Jake laughed
in the minutes before Marin took him to the truck—indicating that he was not at
that point suffering from severe head trauma. 
Jake was then unconscious.  We
hold that the physical evidence and the medical history of the head trauma in
this case provide a sufficiently reliable foundation to support Dr. Milton’s
medical opinion that Jake’s intracranial swelling was not delayed in its onset
but was medically certain to have been a result of blunt force trauma delivered
while Marin was alone with Jake.  The
jury was free to reject the implication that some other person could have
caused Jake’s injuries.  Zuniga v. State, 144 S.W.3d 477, 483 (Tex. Crim. App. 2004)
(holding that jury, not reviewing court, is responsible for accepting or
rejecting properly supported alternative theories of causation).  Thus, we conclude that legally sufficient
evidence supports the jury’s verdict.

          Viewing
all the evidence in a neutral light, factually sufficient evidence also
supports the jury’s finding.  The jury
heard both Dr. Milton and Dr. Plunkett’s testimony.  Neither doctor could say exactly when the
injury occurred, but Dr. Milton opined with reasonable medical certainty that
Jake had become immediately unconscious. 
Dr. Plunkett testified that there was a “suggestion” that Jake’s injury
had worsened only gradually, indicating the possibility that Jake was lucid for
an interval after he suffered the skull fracture.  He was very clear, however, that this was
only a suggestion and not a certainty.  

Marin contends that the State did not
prove that he injured Jake because others had access to Jake and could have
harmed him.  He argues that there was no
evidence that he ever mistreated Jake, and, on the contrary, the witnesses
testified that he was loving and patient with Jake and with other
children.  Jake had suffered previous
injuries, which, Marin contends, could have been inflicted by any of his
caregivers.  Jake’s rib, tibia, and prior
skull fractures occurred after Marin moved out of the Horrocks’ home.  Marin, however, had been spending time with Horrocks
and Jake within the time period that Jake’s other injuries occurred, and had
been taking Jake alone to his truck in the middle of the night for short periods
of time to “bond” with him.  Marin counters
that Horrocks’s father cared for Jake during the day, giving him the better opportunity
to injure Jake, and he suggests Horrocks’s prior struggle with post-partum
depression after her older child was born makes her a suspect as well.  Horrocks and her parents testified that they
were unaware of Jake’s prior injuries and had no idea how they occurred.  Given the evidence of the circumstances
surrounding Jake’s death—including evidence that Jake was alone with Marin when
he became distressed and began to choke and to bleed into his eyes, nose, and
mouth, and that Jake was conscious and laughed prior to Marin’s taking him to
be alone with Marin in his truck—we cannot say that the evidence supporting the
verdict is so weak as to be manifestly unjust, nor is the verdict against the
great weight and preponderance of the evidence. 
We hold that the evidence is factually sufficient to support the
verdict.

Conclusion

We hold that Marin waived his
challenge to the qualifications of the State’s expert witnesses.  We further hold that the evidence is both
legally and factually sufficient to support Marin’s conviction for capital
murder.  We therefore affirm the judgment
of the trial court.

 

 

 

                                                          Jane Bland

                                                          Justice

 

Panel consists of Judges Bland, Sharp,
and Taft.[2]

Do not publish.  Tex.
R. App. P. 47.4











[1] Bill Horrocks testified that Jake was able to pull up,
stand, and sometimes take a few steps. 
Debra Horrocks testified that once when she was changing Jake’s diaper,
she lifted him by the legs, and he screamed. 
Other than that, Horrocks and her parents all testified that they had
not observed any injuries or changes in Jake’s behavior.





[2] Justice Tim Taft, who retired from the First Court of
Appeals on June 1, 2009, continues to sit by assignment for the disposition of
this case, which was submitted on April 28, 2009.