

# NUMBER 13-24-00079-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**ENRIQUE PERDOMO-MEJIA,**                             **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                    **Appellee.**

---

## ON APPEAL FROM THE 427TH DISTRICT COURT
## OF TRAVIS COUNTY, TEXAS

---

## MEMORANDUM OPINION

**Before Chief Justice Tijerina and Justices Peña and West**
**Memorandum Opinion by Chief Justice Tijerina**

A jury convicted appellant Enrique Perdomo-Mejia of continuous sexual abuse of a child, a first-degree felony, and assessed punishment at thirty-five years imprisonment. *See* TEX. PENAL CODE § 21.02. By five issues, appellant argues: (1) the evidence was legally insufficient that the alleged abuse occurred during a period of thirty days or more; (2) appellant's constitutional right to presumption of innocence was violated; (3) the trial

court denied him the right to present admissible alternate perpetrator evidence; (4) the trial court abused its discretion by permitting the State to cross-examine his wife about unduly prejudicial matters; and (5) these cumulative errors warrant reversal. We affirm.[1]

## I.     LEGAL SUFFICIENCY

By his first issue, appellant argues the evidence is "legally insufficient to sustain the conviction because the State failed to prove the time element."

### A.     Pertinent Facts

N.B. and G.B. are cousins and are the alleged victims in this case. Trial commenced on November 13, 2023, and concluded on December 6, 2023.

Nneka Okonkwo testified that she was a middle school teacher at Austin ISD. On March 3, 2019, when N.B. was eleven years old, she observed that N.B. was not doing her math work and instead was writing messages to herself stating that she wanted to kill herself, that she was cutting herself, and that she was being sexually abused.[2]

At the time of trial, N.B. was fifteen years old and in eighth grade. She testified that when she was in third or fourth grade in the years 2018 or 2019, appellant and his father began living with her and family in a one-bedroom duplex. In that duplex, appellant touched her private area several times with his hand and with his penis. He would do this while her mother was at work, and he would do it while she was with her sisters and her brothers. She remembers that one time she, appellant, and her sister K.B. were watching the movie "Angry Birds" when appellant touched her private part and her buttocks with his hands and his penis. N.B. stated that appellant took her clothes off and alternated

---

[1] This appeal was transferred from the Third Court of Appeals in Austin pursuant to an order issued by the Texas Supreme Court. *See* TEX. GOV'T CODE § 73.001. We are required to follow the precedent of the transferor court to the extent it differs from our own. TEX. R. APP. P. 41.3.

[2] These detailed, lengthy messages were extremely suicidal.

between fondling N.B. and K.B. There was another time when he touched her and K.B. in the bedroom. N.B. claims she was asleep, and when she woke up, she was lying on her side. Appellant was nude, had his penis against her buttocks, and her pants were pulled down. N.B. testified that appellant's penis went inside her buttocks, but "not all the way." N.B. stated that there was no penetration.

According to N.B., when she discussed the alleged abuse with her mother P.B., she needed to be calmed down. N.B. was crying in the restroom with P.B. when G.B. overheard the outcry. Unbeknownst to N.B., G.B. informed P.B. that the "same thing happened to her."

K.B. testified that she is thirteen years old and currently in eighth grade. She stated that she witnessed appellant touch N.B. inappropriately on her breast, on her thighs, and on her buttocks. K.B. stated that appellant would fondle N.B. under the blanket in the bedroom but also in the living room. Specifically, in the "last room by the hallway," appellant and N.B. were under the blanket, and she would see the blanket move.

J.B. testified that he is N.B. and K.B.'s brother. While they lived in the duplex, he often saw appellant and his sisters together underneath the blankets. While they were watching movies, appellant often told him to lay down by their feet while appellant and his sisters were behind him. If J.B. turned around, appellant would stop moving under the blankets, and he would instruct J.B. to turn around and watch the movie.

P.B. testified that she is K.B. and N.B.'s mother, and appellant is her cousin. She stated she loved appellant as her own son, she had a great relationship with appellant's father, her uncle, and the outcries "pain[ed] her greatly."

3

P.B. stated that she and the girls have lived at Spring Apartments, Rutland Street, Rundberg Lane, Silver Springs, Bonnie Brae, and another residence, which is their current residence. According to P.B., she first welcomed appellant and her uncle into her apartment on Rutland Street in 2013. At this time, appellant was sixteen or seventeen years old. Then they moved to a duplex on Rundberg Lane in 2015. Appellant was often home alone with her children when they lived on Rundberg Lane. She stated that he would come over frequently and would stay for several hours "playing PlayStation." P.B. stated that they then moved to Bonnie Brae Street in 2018 for almost three years.

P.B. testified that on January 21, 2022, she noticed that N.B. was in the restroom crying. When N.B. informed P.B. of what happened, G.B. overheard and stated, "Aunt, appellant did the same to me as well." According to P.B., there have been many behavioral changes in N.B. because she used to be a happy little girl. Whenever P.B. tries to talk to her about what happened, N.B. "closes up" and "locks herself in the bathroom for hours" because N.B. states that she "feels dirty."

Rosalee Callejas testified that she is a forensic interviewer at the Center for Child Protection Services. She interviewed N.B., and N.B. testified as follows. When N.B. was in third or fourth grade, appellant came over to take care of her and her siblings when her mother was working. N.B. and K.B. were in the living room watching a movie. First, appellant was sitting next to K.B., but "he switched [K.B.] for her." Appellant then took off her pants and underwear and touched her buttocks and vagina. N.B. clarified to Rosalee that he did not penetrate her. After that, he pulled her clothes back on and "switched" her back for K.B. According to N.B., she fell asleep, and when she woke up, she was in the bedroom, and appellant was in between her and K.B. on the bed. N.B. stated she could

4

feel appellant's penis behind her. When she woke up, he got out of the bed and went into the restroom.

G.B. testified that she is nine years old and in fourth grade. After her sixth birthday and when she moved to the United States, appellant began touching her buttocks and vagina with his penis and his hands. Appellant made her feel scared because he would tell her that he was going to kill her and feed her to his dog. He also stated that he was going to fire a gun at her; however, she never saw the gun. G.B. stated that these incidents would occur during the daytime because her father would arrive home from work at night. G.B. stated that she made an outcry when she first overheard N.B. outcrying to P.B. about the incidents. G.B. then told P.B. the same thing happened to her.

Lead forensic interviewer Connie Cahue testified that on February 9, 2022, after G.B. made an outcry of sexual abuse against appellant, Cahue interviewed G.B. Specifically, Connie testified to the following. G.B. stated that appellant had sexually abused her from the ages of five to seven. Cahue stated that she narrowed the time frame because she was able to ask about holidays, places, events, and grades. When G.B. was five years old, she was home alone in appellant's home. As they were watching a movie in his bedroom, he began to touch her inappropriately, but "she kicked him." When she was six years old, appellant tried to insert his penis into her buttocks, and he made comments to her about how she was growing and getting prettier. He attempted to remove her underwear, but she screamed and left the room.

On another instance, when G.B. was celebrating her seventh birthday, appellant tried inserting his penis into her vagina and told her that was her birthday gift and then asked if she liked her birthday gift. On another occasion when she was seven years old,

she was on her tablet at his home. He entered the room with his dog and told her that his dog would bite her if she did not let him touch her.

B.M. is G.B.'s mother and testified that G.B. informed her of the sexual abuse. G.B. told her that appellant rubbed his penis on her vagina and buttocks and threatened to kill her and throw her meat to his dog.

## B. Standard of Review & Applicable Law

The sufficiency of the evidence is measured by the elements of the offense as defined in a hypothetically correct jury charge, which is "one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). "When addressing a challenge to the sufficiency of the evidence, we consider whether, after viewing all of the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Zuniga v. State*, 551 S.W.3d 729, 732 (Tex. Crim. App. 2018) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

"This standard requires the appellate court to defer 'to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Id.* (quoting *Jackson*, 443 U.S. at 319). "We may not re-weigh the evidence or substitute our judgment for that of the factfinder." *Id.* (citing *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007)). Although factfinders "may not speculate about the meaning of facts or evidence," they are permitted to "draw any reasonable inferences from the facts so long as each inference is

supported by the evidence presented at trial." *Id.* (citing *Cary v. State*, 507 S.W.3d 750, 757 (Tex. Crim. App. 2016); *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007)). "We presume that the factfinder resolved any conflicting inferences from the evidence in favor of the verdict, and we defer to that resolution." *Id.* (citing *Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012)). This is because the factfinders are "the exclusive judges of the facts, the credibility of the witnesses, and the weight to be given to the testimony." *Id.* (citing *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010)). "Direct evidence and circumstantial evidence are equally probative, and circumstantial evidence alone may be sufficient to uphold a conviction so long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Id.* (citing *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015)).

A person commits the offense of continuous sexual abuse of a child if the person commits two or more acts of sexual abuse against a child under fourteen during a period that is thirty or more days in duration, when the person is at least seventeen years of age at the time each act of abuse is committed. *See* TEX. PENAL CODE § 21.02(b); *Pelcastre v. State*, 654 S.W.3d 579, 584 (Tex. App.—Houston [14th Dist.] 2022, pet. ref'd).

## C.    Discussion

Appellant only challenges the element that the sexual abuse occurred over a period of thirty days or more. N.B. testified that appellant sexually abused her when she was in third or fourth grade, which occurred in the years 2018 or 2019. She clarified that the abuse happened when she lived in this duplex before she lived on Bonnie Brae Street. Similarly, G.B. testified that appellant sexually abused after her "sixth-year birthday happened" and when she moved to the United States, which was the year 2020. *Witcher*

*v. State*, 638 S.W.3d 707, 710 (Tex. Crim. App. 2022) (concluding the State had satisfied the time element even though testimony about dates was vague and used phrases such as "around that time" and "give or take"). The testimony of a victim, even when the victim is a child, is sufficient to support a conviction for sexual assault. TEX. CODE CRIM. PROC. Art. 38.07(b)(1). G.B. clarified that she outcried to P.B. one year later in 2022 when she was seven years old and that appellant touched her inappropriately up until her confession. *See Smith v. State*, 340 S.W.3d 41, 49 (Tex. App.—Houston [1st Dist.] 2011, no pet.) ("Although the complainant did not know the precise dates of the events, her description of the ongoing sexual assaults is precisely what the Legislature intended to address when this statute was enacted."); *see also Flanagin v. State*, No. 05-19-00858-CR, 2021 WL 2253502, at *6 (Tex. App.—Dallas June 3, 2021, no pet.) (mem. op., not designated for publication) (although the child only specifically described one act of sexual abuse, her testimony that the same "kind of touching" occurred previously provided legally sufficient evidence to support a conviction for continuous sexual abuse of a young child).

P.B. affirmed that appellant was alone with N.B. on several occasions beginning from the year 2013, and in 2022, N.B. and G.B. made outcries to P.B. of sexual abuse. *See Tear v. State*, 74 S.W.3d 555, 560 (Tex. App.—Dallas 2002, pet. ref'd) (providing that testimony regarding a child victim's outcry statement alone can be sufficient to support a conviction for aggravated sexual assault).

As the fact finder, the jury was responsible to fairly resolve conflicts in testimony, weigh the evidence, and draw reasonable inferences. *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016). The jury could have reasonably concluded that the abuse

8

regarding N.B. occurred anytime from 2017 to 2019 and that the abuse regarding G.B. occurred anytime from 2019 to 2021. *See id.* Furthermore, the jury could have reasonably inferred that more than thirty days elapsed between the events N.B. and G.B. described. Thus, we conclude it was reasonable for the jury to conclude that based on the testimony at trial, the State satisfied the thirty-day requirement. *See Jenkins*, 493 S.W.3d at 599. Accordingly, we overrule appellant's first issue.

## II. PRESUMPTION OF INNOCENCE

By his second issue, appellant argues that the trial court violated his constitutional right to the presumption of innocence by permitting armed guards to sit by him throughout trial. Specifically, appellant argues the trial court "reversibly erred in requiring or permitting, for no articulable reason" the presence of armed guards behind him during his testimony and sitting by him at his table. He contends that this is akin to being shackled.

The Texas Court of Criminal Appeals has explained that "[s]ince the presence of armed guards is not inherently prejudicial, appellant must show actual prejudice." *Sterling v. State*, 830 S.W.2d 114, 118 (Tex. Crim. App. 1992). Here, "[t]he record in the instant case does not support a finding that appellant suffered actual prejudice." *Gravis v. State*, 982 S.W.2d 933, 936 (Tex. App.—Austin 1998, pet. ref'd); *see also Compton v. State*, 666 S.W.3d 685, 726 (Tex. Crim. App. 2023) (deciding that the presence of uniformed Texas Department of Criminal Justice employees that "comprised up to one-fourth of the gallery" during the punishment phase did not inherently prejudice his right to a fair trial). Other than the location of the guards, there is no evidence that seeing appellant with the deputies in any way affected jury deliberations or the verdict. *See Buntion v. State*, 482 S.W.3d 58, 79 (Tex. Crim. App. 2016); *see also Chanthakoummane v. State*, No. AP-

75,794, 2010 WL 1696789, at *9 (Tex. Crim. App. Apr. 28, 2010) ("There was no showing that their presence was conspicuous, confusing, or distracting to the prospective jurors."). Appellant did not point to any disturbance or other prejudicial circumstance in the record caused by the presence of the deputies. To the contrary, the trial court explained that it "cannot make rules that affect the [Sheriff] as to what her deputies do or do not do to cover courthouse security." The trial court explained that "per policy of the elected official . . . as sheriff," there would be a deputy sitting with appellant. The trial court added that outside the presence of the jury, it would have appellant seated in the witness chair without having to walk back and forth with a deputy to "prevent any unfair bias or prejudice" nonetheless.

In the absence of a showing of actual prejudice, we conclude that the trial court did not err in overruling appellant's objections. *See Easley v. State*, 424 S.W.3d 535, 538 n.23 (Tex. Crim. App. 2014) ("[T]his Court cannot hold that the mute and distant presence of twenty peace officers—comprising roughly one-fifth of the spectator gallery—is prejudicial, per se, without some other indication of prejudice."). We overrule appellant's second issue.

### III.    ADMISSION AND EXCLUSION OF EVIDENCE

By his third issue, appellant argues that his constitutional right to present a defense was violated when the trial court denied him the right to question the complainants about alleged identical abuse they suffered by other perpetrators. Appellant informed the trial court that this evidence was necessary to support his defensive theory that: (1) N.B. and G.B. "were conflating the abuse they had suffered at the hands of prior perpetrators"; (2) their descriptions of the other abuse were so similar to that which they alleged of

10

appellant; and (3) the prior abuse was the basis for their sexual knowledge.

## A. Standard of Review & Applicable Law

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016); *Sandoval v. State*, 409 S.W.3d 259, 297 (Tex. App.—Austin 2013, no pet.); *see also Miller v. State*, 36 S.W.3d 503, 507 (Tex. Crim. App. 2001) (providing that this standard applies when the accused complains that the exclusion of evidence denied him his constitutional right to a meaningful opportunity to present a defense). An abuse of discretion does not occur unless the trial court acts "arbitrarily or unreasonably" or "without reference to any guiding rules and principles." *State v. Hill*, 499 S.W.3d 853, 865 (Tex. Crim. App. 2016) (quoting *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990)). Further, we may not reverse the trial court's ruling unless the determination "falls outside the zone of reasonable disagreement." *Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016). An evidentiary ruling will be upheld if it is correct on any theory of law applicable to the case. *Henley*, 493 S.W.3d at 93; Sandoval, 409 S.W.3d at 297.

"Evidentiary rulings rarely rise to the level of denying the fundamental constitutional right to present a meaningful defense." *Martinez v. State*, 212 S.W.3d 411, 423 (Tex. App.—Austin 2006, pet. ref'd); *Potier v. State*, 68 S.W.3d 657, 659 (Tex. Crim. App. 2002). A trial court's ruling excluding evidence may rise to the level of a constitutional violation if the ruling excludes relevant and reliable evidence which "forms such a vital portion of the case that exclusion effectively precludes the defendant from presenting a defense." *Wiley v. State*, 74 S.W.3d 399, 405 (Tex. Crim. App. 2002). Regarding "alternative perpetrator evidence," appellant "must show that his proffered evidence

regarding the alleged alternative perpetrator is sufficient, on its own or in combination with other evidence in the record, to show a nexus between the crime charged and the alleged 'alternative perpetrator.'" *Martinez*, 212 S.W.3d at 423.

## B.     Pertinent Facts

Outside the presence of the jury, the trial court was informed that the other perpetrators were G.B.'s grandfather and N.B.'s father. During voir dire and outside the presence of the jury, N.B. testified that her father performed oral sex on her and would also touch her inappropriately with his hand. The State informed the trial court that it would recall another witness who would confirm "that a lot of the vaginal touch" of N.B.'s father "was under the guise of a doctor," which is substantially different than N.B.'s allegations against appellant. N.B. was also forced to perform oral sex, and oral sex had additionally been performed on her by her father. The State also argued that based on N.B.'s testimony, "there's no question in her mind who the identity of the perpetrator was" in appellant's case. The trial court sustained the State's objection to this evidence.

During voir dire and outside the presence of the jury, G.B. testified that in Honduras, her grandfather did "bad things" to her when she was three years old, such as touching her with his penis in the same way appellant touched her. G.B. stated that she did not remember a lot of what happened with her grandfather, but she did remember that it all happened in Honduras when she was younger than five years old. G.B. denied that anything ejected out of her grandfather's penis.

The State argued that there was no nexus between those allegations and appellant's actions. Primarily, the State argued that grandfather's allegations occurred in an entirely different country, so the fact that she distinctly remembers appellant assaulting

12

her in the United States is entirely different. Additionally, the State argued that there were concerns with G.B.'s memories when she was three years old due to infantile syndrome, which would confuse the jury.[3] The State argued that G.B.'s memories from the age of three were not "reliable to be looking at given infantile syndrome." The State also argued that the relationship between the offenders is very different because her grandfather was an immediate family member, and appellant is merely a distant half cousin. Lastly, the State stated that G.B.'s grandfather was forcing G.B. to perform oral sex on him, which has not been alleged here. While G.B. denied that anything came out of her grandfather's penis, G.B. testified that "something white" came out of appellant's penis and "some clear, like saliva-like" was coming out of her parts. Thus, the State argued that these alternate allegations were very different than the vaginal touching that was alleged here.

C.      **Discussion**

Based on our review of the record, appellant has failed to demonstrate the required nexus between N.B.'s father, G.B.'s grandfather, and the alleged crimes here. *See Ruiz v. State*, 272 S.W.3d 819, 830 (Tex. App.—Austin 2008, no pet.) ("The defense did not argue that K.T. was mistaken about who had abused her over a period of four or five years."). G.B.'s prior allegations occurred in Honduras while she claims appellant assaulted her in the United States. Furthermore, G.B. was much younger when she described the abuse she suffered from her grandfather. Thus, the trial court differentiated between her grandfather's actions and appellant's actions. *See Martinez*, 212 S.W.3d at 423. Furthermore, G.B. and N.B. identified appellant with certainty. *See Ex Parte Huddlestun*, 505 S.W.3d 646, 661 (Tex. App.—Texarkana 2016, pet. ref'd) ("The

---

[3] The State added that the trial court had previously heard testimony from Dr. Thorne "about relying on any memories from that age."

13

alternative perpetrator defense typically arises in 'who done it' cases where the complaining witness does not know [her] attacker."); *Ruiz*, 272 S.W.3d at 830 (noting that allegations of abuse against a grandfather, even if true, "would not bear on whether appellant also abused her"); *see also MacDonald v. State*, No. 09-18-00399-CR, 2020 WL 1036443, at *5 (Tex. App.—Beaumont Mar. 4, 2020, pet. ref'd) (mem. op., not designated for publication) ("The absence of the requisite nexus is especially true when J.B. positively identified her father, rather than a stranger, as the one who penetrated her anus with his sexual organ."); *Ramirez v. State*, No.14-05-00435-CR, 2006 WL 2345952, at *4 (Tex. App.—Houston [14th Dist.] Aug. 15, 2006, no pet.) (mem. op., not designated for publication) (noting that the absence of a nexus was especially true when the victim testified with certainty her father "did these things," even though she lived with other different male adults). Additionally, the State argued that a lot of the alleged alternative abuse for N.B. occurred around playing doctor, which did not occur here. *See* TEX. R. EVID. 401; *Martinez*, 212 S.W.3d at 423. Therefore, the trial court could have reasonably concluded that appellant failed to establish the required nexus to an alleged alternative perpetrator theory. Accordingly, the trial court did not abuse its discretion in limiting the scope of cross-examination of N.B. and G.B regarding the alleged alternate perpetrator evidence. *See Miller*, 36 S.W.3d at 507. We overrule appellant's third issue.

## IV. RULE 401 AND 403

By his fourth issue, appellant argues the trial court abused its discretion when it permitted the State to cross-examine his wife about irrelevant and unfairly prejudicial matters regarding their marriage in violation of Texas Rules of Evidence 401 and 403.

**A.     Applicable Law**

Under the rules of evidence, evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and if "the fact is of consequence in determining the action." TEX. R. EVID. 401. Rule 403 provides that relevant evidence may be excluded if "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." *Id.* R. 403. "Under Rule 403, it is presumed that the probative value of relevant evidence exceeds any danger of unfair prejudice. The rule envisions exclusion of evidence only when there is a clear disparity between the degree of prejudice of the offered evidence and its probative value." *Hammer v. State*, 296 S.W.3d 555, 568 (Tex. Crim. App. 2009). "[R]eviewing courts should afford trial courts a high level of deference regarding admissibility determinations under Rule 403." *Brickley v. State*, 623 S.W.3d 68, 79 (Tex. App.—Austin 2021, pet. ref'd).

"[C]ourts generally balance the following factors when performing a Rule 403 analysis: '(1) how probative the evidence is; (2) the potential of the evidence to impress the jury in some irrational, but nevertheless indelible way; (3) the time the proponent needs to develop the evidence; and (4) the proponent's need for the evidence.'" *Colone v. State*, 573 S.W.3d 249, 266 (Tex. Crim. App. 2019).

**B.     Testimony**

Appellant complains of the following cross-examination testimony from his wife Kimberly Flores:

> [The State]:   What other words would people use to describe the
>                 relationship between you and your husband?

15

[Defense]: Objection to the relevance of that, Judge, what other people would use.

. . . .

A: As my best friend. My first love. My only love.

[The State]: Have you ever called your relationship toxic on Facebook?

[Defense]: Objection to the relevance of that, Judge, and 403.

The Court: Overruled.

A: No.

[The State]: Are you sure?

A: I have put images, but I haven't talked about my relationship.

[The State]: So you've never used the hashtag toxic?

A: No.

[The State]: Have you ever had discussions on your social media?

A: No.

[The State]: Have you ever had a conversation where you all-joked about a wife kindly running someone out of the house by throwing everything out of the home?

[Defense]: Objection to relevance, Judge, and also 403.

The Court: Overruled.

A: Yes. With my family and my siblings.

[The State]: About your relationship?

A: No. Never got to that point.

[The State]: [State introduces Exhibit 38 for authentication]

. . . .

16

[The State]: What is the current state of the relationship between you and your husband? How would you define it?

[Defense]: Objection to that as to relevance, Judge.

The Court: Overruled

. . . .

[Defense]: This is what I had raised before in the motion in limine and I wanted to renew that objection. I don't think it's relevant what their relationship is now months—18 months after he was arrested. I just don't think that that's relevant number one. Number two, I would object under 403.

The Court: I'm going to overrule the objection.

[The State]: How would you describe the relationship between you and your husband today?

A: He's still my husband. He's my daughter's father.

[The State]: And is it not true that you are in another relationship?

A: Is that important?

[The State]: It is.

A: Okay. Why?

[The State]: Have you-all not discussed burning your marriage certificate?

[Defense]: Judge, this is irrelevant.

The Court: Overruled.

[Defense]: And 403.

The Court: Overruled.

[The State]: Would it surprise you if your husband has joked on jail calls about receiving his certificate in the mail and that he plans to burn it?

17

A:          Yes.

[The State]:  Did you and your husband have a conversation about you-all no longer being together?

A:          Yes.

[The State]:  And that you're just doing this for your daughter?

A:          No.

[The State]:  Are you sure?

A:          Yes.

. . . .

[The State]:  So I'm going to ask you again. Would it surprise you that there is a recorded conversation about you-all discussing burning your marriage certificate?

A:          No.

[The State]:  It wouldn't surprise you?

A:          No. Because that conversation did happen.

## C. Discussion

Appellant's defense theory included arguments that the alleged abuse was impossible because appellant's busy schedule could not have permitted it as it left him no time to be alone with the victims. Kimberly testified that she knew appellant's whereabouts and location twenty-four hours a day and seven days a week. She stated that appellant worked every single day, and she would physically see him at work daily. The State was entitled to impeach Kimberly by eliciting the true nature of her relationship with appellant and to rebut his theory that there was no opportunity for him to have committed the alleged sexual acts. *See Powell v. State*, 63 S.W.3d 435, 438–40 (Tex. Crim. App. 2001) (defendant's statement that he lacked opportunity to molest the

18

complainant under the circumstances of the charged offense opened the door to admission of extraneous-offense evidence to rebut defendant's lack of opportunity defensive theory). "To hold otherwise would allow a party to create a favorable inference while depriving the other party of the truth-finding mechanism of cross-examination." *Bowley v. State*, 310 S.W.3d 431, 435 (Tex. Crim. App. 2010)

Furthermore, it is unlikely that the jury convicted him of alleged sexual abuse based on the brief testimony of conflict in appellant's marriage as that evidence had no tendency to confuse or distract the jury from the allegations of continuous sexual assault, which were the issues at trial. Kimberly's testimony was not scientific or technical in nature, and appellant does not tell us why this evidence had the tendency to mislead the jury. *See Gigliobianco*, 210 S.W.3d at 641 (providing scientific evidence as an example of the type of evidence that "might mislead a jury that is not properly equipped to judge" its "probative force"). Lastly, the cross-examination appellant complains of had no tendency to be given undue weight by the jury. The jury heard testimony from two alleged victims of alleged sexual abuse over a span of three weeks. The presentation of the evidence did not consume an inordinate amount of time, and it was not repetitive of previously admitted evidence. *See id.* at 642. In fact, Kimberely was only one of at least twenty-eight witnesses. *See Robisheaux v. State*, 483 S.W.3d 205, 221 (Tex. App.—Austin 2016, pet. ref'd) (holding that extraneous-offense evidence did not consume an inordinate amount of time when it took up eight pages of the reporter's record that was "hundreds of pages long"). Thus, we conclude that the trial court did not abuse its discretion when it allowed the State to cross-examine Kimberly. We overrule appellant's fourth issue.

## V.     CUMULATIVE ERROR

By his fifth issue, appellant argues that the cumulative effect of these errors requires a new trial. However, having found no error to each of these claims separately, we find no cumulative harm. *See Hughes v. State*, 24 S.W.3d 833, 844 (Tex. Crim. App. 2000) (declining to find harm in "cumulative effect" of alleged constitutional violations after finding no constitutional violations). We overrule his last issue.

## VI.     CONCLUSION

We affirm the judgment of the trial court.

JAIME TIJERINA
Chief Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
8th day of January, 2026.